# KONIGSBERG *v.* STATE BAR OF CALIFORNIA ET AL.

No. 28.   Argued December 14, 1960.—Decided April 24, 1961.

*Edward Mosk* argued the cause for petitioner. With him on the brief was *Sam Rosenwein.*

*Frank B. Belcher* argued the cause for respondents. With him on the brief was *Ralph E. Lewis.*

Briefs of *amici curiae,* urging reversal, were filed by *David Scribner, Leonard B. Boudin, Ben Margolis, William B. Murrish* and *Charles Stewart* for the National Lawyers Guild; *A. L. Wirin, Fred Okrand* and *Hugh R. Manes* for the American Civil Liberties Union of Southern California; and *Robert L. Brock, Pauline Epstein, Robert W. Kenny, Hugh R. Manes, Ben Margolis, Daniel G. Marshall, William B. Murrish, John McTernan, Maynard Omerberg, Alexander Schullman* and *David Sokol* on behalf of themselves and certain other members of the California Bar.

Mr. Justice Harlan delivered the opinion of the Court.

This case, involving California's second rejection of petitioner's application for admission to the state bar, is a sequel to *Konigsberg* v. *State Bar,* 353 U. S. 252, in which this Court reversed the State's initial refusal of his application.

Under California law the State Supreme Court may admit to the practice of law any applicant whose qualifications have been certified to it by the California Committee of Bar Examiners. Cal. Bus. & Prof. Code § 6064. To qualify for certification an applicant must, among other things, be of "good moral character," *id.,* § 6060 (c), and no person may be certified "who advocates the overthrow of the Government of the United States or of this State by force, violence, or other unconstitutional means . . . ." *Id.,* § 6064.1. The Committee is empowered and required to ascertain the qualifications of all candidates. *Id.,* § 6046. Under rules prescribed by the Board of Governors of the State Bar, an applicant before

the Committee has "the burden of proving that he is possessed of good moral character, of removing any and all reasonable suspicion of moral unfitness, and that he is entitled to the high regard and confidence of the public." *Id.,* Div. 3, c. 4, Rule X, § 101. Any applicant denied certification may have the Committee's action reviewed by the State Supreme Court. *Id.,* § 6066.

In 1953 petitioner, having successfully passed the California bar examinations, applied for certification for bar membership. The Committee, after interrogating Konigsberg and receiving considerable evidence as to his qualifications, declined to certify him on the ground that he had failed to meet the burden of proving his eligibility under the two statutory requirements relating to good moral character and nonadvocacy of violent overthrow. That determination centered largely around Konigsberg's repeated refusals to answer Committee questions as to his present or past membership in the Communist Party.[1] The California Supreme Court denied review without opinion. See 52 Cal. 2d 769, 770, 344 P. 2d 777, 778.

On certiorari this Court, after reviewing the record, held the state determination to have been without rational support in the evidence and therefore offensive to the Due Process Clause of the Fourteenth Amendment. *Konigsberg* v. *State Bar, supra.* At the same time the Court declined to decide whether Konigsberg's refusals to answer could constitutionally afford "an independent ground for exclusion from the Bar," considering that such an issue was not before it. *Id.,* 259–262. The case was remanded

---

[1] Konigsberg rested his refusals, not on any claim of privilege against self-incrimination, but on the ground that such inquiries were beyond the purview of the Committee's authority, and infringed rights of free thought, association, and expression assured him under the State and Federal Constitutions. He affirmatively asserted, however, his disbelief in violent overthrow of government.

to the State Supreme Court "for further proceedings not inconsistent with this opinion." *Id.*, 274.

On remand petitioner moved the California Supreme Court for immediate admission to the bar. The court vacated its previous order denying review and referred the matter to the Bar Committee for further consideration. At the ensuing Committee hearings Konigsberg introduced further evidence as to his good moral character (none of which was rebutted), reiterated unequivocally his disbelief in violent overthrow, and stated that he had never knowingly been a member of any organization which advocated such action. He persisted, however, in his refusals to answer any questions relating to his membership in the Communist Party. The Committee again declined to certify him, this time on the ground that his refusals to answer had obstructed a full investigation into his qualifications.[2] The California Supreme Court, by a divided vote, refused review, and also denied Konigsberg's motion for direct admission to practice.[3] 52 Cal. 2d 769,

---

[2] The Committee made the following findings relevant to the issues now before us:

"(1) That the questions put to the applicant by the Committee concerning past or present membership in or affiliation with the Communist Party are material to a proper and complete investigation of his qualifications for admission to practice law in the State of California.

"(2) That the refusal of applicant to answer said questions has obstructed a proper and complete investigation of applicant's qualifications for admission to practice law in the State of California."

[3] The essence of the state court's decision 'appears in the following extracts from its opinion:

". . . The committee action now before us contains no findings or conclusion that petitioner had failed to establish either his good moral character or his abstention from advocacy of overthrow of the government.

"Here it is the refusal to answer material questions which is the basis for denial of certification. . . .

344 P. 2d 777. We again brought the case here. 362 U. S. 910.

Petitioner's contentions in this Court in support of reversal of the California Supreme Court's order are reducible to three propositions: (1) the State's action was inconsistent with this Court's decision in the earlier *Konigsberg* case; (2) assuming the Committee's inquiries into Konigsberg's possible Communist Party membership were permissible, it was unconstitutionally arbitrary for the State to deny him admission because of his refusals to answer; and (3) in any event, Konigsberg was constitutionally justified in refusing to answer these questions.

## I.

Consideration of petitioner's contentions as to the effect of this Court's decision in the former *Konigsberg* case requires that there be kept clearly in mind what is entailed in California's rule, comparable to that in many States, that an applicant for admission to the bar bears the burden of proof of "good moral character" [4]—a

---

". . . [T]o admit applicants who refuse to answer the committee's questions upon these subjects would nullify the concededly valid legislative direction to the committee. Such a rule would effectively stifle committee inquiry upon issues legislatively declared to be relevant to that issue." *Id.*, at 772, 774, 344 P. 2d, at 779, 780.

Justice Traynor dissented on the ground that the California Supreme Court, not being required by statute to exclude bar applicants on the sole ground of their refusal to answer questions concerning possible advocacy of the overthrow of government, should not adopt such an exclusionary rule, at least where the Committee of Bar Examiners has not come forward with some evidence of advocacy. He declined to reach constitutional issues. Justice Peters dissented on federal constitutional grounds and in the belief that this Court's decision in the first *Konigsberg* case required immediate admission of the applicant. Chief Justice Gibson did not participate in the decision.

[4] All of the 50 States, as well as Puerto Rico and the District of Columbia, prescribe qualifications of moral character as precondi-

requirement whose validity is not, nor could well be, drawn in question here.[5]

Under such a rule an applicant must initially furnish enough evidence of good character to make a prima facie case. The examining Committee then has the opportunity to rebut that showing with evidence of bad character. Such evidence may result from the Committee's own independent investigation, from an applicant's responses

tions for admission to the practice of law. See West Publishing Co., Rules for Admission to the Bar (35th ed. 1957); Survey of the Legal Profession, Bar Examinations and Requirements for Admission to the Bar (1952); Jackson, Character Requirements for Admission to the Bar, 20 Fordham L. Rev. 305 (1951); Annot., 64 A. L. R. 2d 301 (1959).

The burden of demonstrating good moral character is regularly placed upon the bar applicant. *Ex parte Montgomery*, 249 Ala. 378, 31 So. 2d 85; *In re Stephenson*, 243 Ala. 342, 10 So. 2d 1; *Application of Courtney*, 83 Ariz. 231, 319 P. 2d 991; Ark. Stat. Ann., 1947, §§ 25–101, 25–103; *Spears* v. *State Bar*, 211 Cal. 183, 294 P. 697; *O'Brien's Petition*, 79 Conn. 46, 63 A. 777; *In re Durant*, 80 Conn. 140, 147, 67 A. 497; Del. Sup. Ct. Rule 31 (1)(A)(a), (2)(A)(a); *Coleman* v. *Watts*, 81 So. 2d 650 (Fla.) (burden of proof on applicant; prima facie showing shifts burden of going forward to Examiners); *Gordon* v. *Clinkscales*, 215 Ga. 843, 114 S. E. 2d 15; *In re Latimer*, 11 Ill. 2d 327, 143 N. E. 2d 20 (semble); *Rosencranz* v. *Tidrington*, 193 Ind. 472, 141 N. E. 58; *In re Meredith*, 272 S. W. 2d 456 (Ky.); *In re Meyerson*, 190 Md. 671, 59 A. 2d 489 (semble); *Matter of Keenan*, 313 Mass. 186, 47 N. E. 2d 12; *Application of Smith*, 220 Minn. 197, 19 N. W. 2d 324 (semble); *On Application for Attorney's License*, 21 N. J. L. 345; *Application of Cassidy*, 268 App. Div. 282, 51 N. Y. S. 2d 202, aff'd, 296 N. Y. 926, 73 N. E. 2d 41; *Application of Farmer*, 191 N. C. 235, 131 S. E. 661; *In re Weinstein*, 150 Ore. 1, 42 P. 2d 744; *State ex rel. Board* v. *Poyntz*, 152 Ore. 592, 52 P. 2d 1141 (burden of proof on applicant; prima facie showing shifts burden of going forward to Examiners); *In the Matter of Eary*, 134 W. Va. 204, 58 S. E. 2d 647 (semble).

[5] For reasons given later (pp. 55–56, *infra*), we need not decide whether California's burden-of-proof rule could constitutionally be applied, as it was by the Committee after the first Konigsberg proceedings, to the requirement of nonadvocacy of violent overthrow.

42

to questions on his application form, or from Committee interrogation of the applicant himself. This interrogation may well be of decisive importance for, as all familiar with bar admission proceedings know, exclusion of unworthy candidates frequently depends upon the thoroughness of the Committee's questioning, revealing as it may infirmities in an otherwise satisfactory showing on his part. This is especially so where a bar committee, as is not infrequently the case, has no means of conducting an independent investigation of its own into an applicant's qualifications. If at the conclusion of the proceedings the evidence of good character and that of bad character are found in even balance, the State may refuse admission to the applicant, just as in an ordinary suit a plaintiff may fail in his case because he has not met his burden of proof.

In the first *Konigsberg* case this Court was concerned solely with the question whether the balance between the favorable and unfavorable evidence as to Konigsberg's qualifications had been struck in accordance with the requirements of due process. It was there held, first, that Konigsberg had made out a prima facie case of good character and of nonadvocacy of violent overthrow, and, second, that the other evidence in the record could not, even with the aid of all reasonable inferences flowing therefrom, cast such doubts upon petitioner's prima facie case as to justify any finding other than that these two California qualification requirements had been satisfied.[6] In assessing the significance of Konigsberg's refusal to answer questions as to Communist Party membership, the Court dealt only with the fact that this refusal could not provide any reasonable indication of a character not meet-

---

[6] The Court assumed, but did not discuss, the constitutionality of California's burden-of-proof rule as applied to the nonadvocacy-of-forcible-overthrow requirement of the California statute.

ing these two standards for admission. The Court did not consider, but reserved for later decision, all questions as to the permissibility of the State treating Konigsberg's refusal to answer as a ground for exclusion, not because it was evidence from which substantive conclusions might be drawn, but because the refusal had thwarted a full investigation into his qualifications. See 353 U. S., at 259–262. The State now asserts that ground for exclusion, an issue that is not foreclosed by anything in this Court's earlier opinion which decided a quite different question.

It is equally clear that the State's ordering of the rehearing which led to petitioner's exclusion manifested no disrespect of the effect of the mandate in that case, which expressly left the matter open for further state proceedings "not inconsistent with" the Court's opinion. There is no basis for any suggestion that the State in so proceeding has adopted unusual or discriminatory procedures to avoid the normal consequences of this Court's earlier determination. In its earlier proceeding, the California Bar Committee may have found further investigation and questioning of petitioner unnecessary when, in its view, the applicant's prima facie case of qualifications had been sufficiently rebutted by evidence already in the record. While in its former opinion this Court held that the State could not constitutionally so conclude, it did not undertake to preclude the state agency from asking any questions or from conducting any investigation that it might have thought necessary had it known that the basis of its then decision would be overturned. In recalling Konigsberg for further testimony, the Committee did only what this Court has consistently held that federal administrative tribunals may do on remand after a reviewing court has set aside agency orders as unsupported by requisite findings of fact. *Federal Communications*

*Comm'n* v. *Pottsville Broadcasting Co.*, 309 U. S. 134; *Fly* v. *Heitmeyer*, 309 U. S. 146.

In the absence of the slightest indication of any purpose on the part of the State to evade the Court's prior decision, principles of finality protecting the parties to this state litigation are, within broad limits of fundamental fairness, solely the concern of California law. Such limits are broad even in a criminal case, see *Bryan* v. *United States*, 338 U. S. 552; *Hoag* v. *New Jersey*, 356 U. S. 464; cf. *Palko* v. *Connecticut*, 302 U. S. 319, 328. In this instance they certainly have not been transgressed by the State's merely taking further action in this essentially administrative type of proceeding.[7]

## II.

We think it clear that the Fourteenth Amendment's protection against arbitrary state action does not forbid a State from denying admission to a bar applicant so long as he refuses to provide unprivileged answers to questions having a substantial relevance to his qualifications. An investigation of this character, like a civil suit, requires procedural as well as substantive rules. It is surely not doubtful that a State could validly adopt an administrative rule analogous to Rule 37 (b) of the Federal Rules of Civil Procedure which provides that that refusal, after due warning, to answer relevant questions may result in "the matters regarding which the questions were asked" being

---

[7] Moreover, even if there could be debate as to whether this Court's prior decision prevented new hearings on matters that had already transpired at the time of the first state hearings, there can be no doubt that such decision did not prevent California from investigating petitioner's actions during the period subsequent to the first hearing. Therefore we would in any case be presented with the question of the constitutionality of the State's refusing to admit petitioner to the practice of law because of his declining to answer whether he has been a member of the Communist Party since the termination of the first set of hearings.

considered for the purposes of the proceeding to be answered in a way unfavorable to the refusing party, or even that such refusal may result in "dismissing the action or proceeding" of the party asking affirmative relief.

The state procedural rule involved here is a less broad one, for all that California has in effect said is that in cases where, on matters material to an applicant's qualifications, there are gaps in the evidence presented by him which the agency charged with certification considers should be filled in the appropriate exercise of its responsibilities, an applicant will not be admitted to practice unless and until he cooperates with the agency's efforts to fill those gaps. The fact that this rule finds its source in the supervisory powers of the California Supreme Court over admissions to the bar, rather than in legislation, is not constitutionally significant. *Nashville, C. & St. L. R. Co.* v. *Browning*, 310 U. S. 362. Nor in the absence of a showing of arbitrary or discriminatory application in a particular case, is it a matter of federal concern whether such a rule requires the rejection of all applicants refusing to answer material questions, or only in instances where the examining committee deems that a refusal has materially obstructed its investigation. Compare *Beilan* v. *Board of Education*, 357 U. S. 399, with *Nelson* v. *County of Los Angeles*, 362 U. S. 1.

In the context of the entire record of these proceedings,[8] the application of the California rule in this instance cannot be said to be arbitrary or discriminatory. In the first *Konigsberg* case this Court held that neither the somewhat weak but uncontradicted testimony, that petitioner had been a Communist Party member in 1941, nor his refusal to answer questions relating to Party membership, could rationally support any substantive adverse

---

[8] The transcript of the original hearings before the Committee has been made part of the record before us in the present case. .

inferences as to petitioner's character qualifications, 353 U. S., at 266–274. That was not to say, however, that these factors, singly or together, could not be regarded as leaving the investigatory record in sufficient uncertainty as constitutionally to permit application of the procedural rule which the State has now invoked, provided that Konigsberg had been first given due warning of the consequences of his continuing refusal to respond to the Committee's questions. Cf. 353 U. S., at 261.

It is no answer to say that petitioner has made out a prima facie case of qualifications, for this is precisely the posture of a proceeding in which the Committee's right to examine and cross-examine becomes significant. Assuming, as we do for the moment, that there is no privilege here to refuse to answer, petitioner could no more insist that his prima facie case makes improper further questioning of him than he could insist that such circumstance made improper the introduction of other forms of rebutting evidence.

We likewise regard as untenable petitioner's contentions that the questions as to Communist Party membership were made irrelevant either by the fact that bare, innocent membership is not a ground of disqualification or by petitioner's willingness to answer such ultimate questions as whether he himself believed in violent overthrow or knowingly belonged to an organization advocating violent overthrow. The Committee Chairman's answer to the former contention was entirely correct:

> "If you answered the question, for example, that you had been a member of the Communist Party during some period since 1951 or that you were presently a member of the Communist Party, the Committee would then be in a position to ask you what acts you engaged in to carry out the functions and purposes of that party, what the aims and purposes of

the party were, to your knowledge, and questions of that type. You see by failing to answer the initial question there certainly is no basis and no opportunity for us to investigate with respect to the other matters to which the initial question might very well be considered preliminary."

And the explanation given to petitioner's counsel by another Committee member as to why Konigsberg's testimony about ultimate facts was not dispositive was also sound:

"Mr. Mosk, you realize that if Mr. Konigsberg had answered the question that he refused to answer, an entirely new area of investigation might be opened up, and this Committee might be able to ascertain from Mr. Konigsberg that perhaps he is now and for many years past has been an active member of the Communist Party, and from finding out who his associates were in that enterprise we might discover that he does advocate the overthrow of this government by force and violence. I am not saying that he would do that, but it is a possibility, and we don't have to take any witness' testimony as precluding us from trying to discover if he is telling the truth. That is the point."

Petitioner's further miscellaneous contentions that the State's exclusion of him was capricious are all also insubstantial.[9]

---

[9] There is no basis for any intimation that the California Supreme Court fashioned a special procedural rule for the purposes of this particular case. The California Bar Committee has in the past declined to certify applicants who refused to answer pertinent questions. See Farley (Secretary, Committee of Bar Examiners), Character Investigation of Applicants for Admission, 29 Cal. State Bar Journal, 454, 457, 466 (1954). No more does the State's action bear any of the hallmarks of a bill of attainder or of an *ex post facto* regulation, see *Cummings* v. *Missouri,* 4 Wall. 277; cf. *United*

48

There remains the question as to whether Konigsberg was adequately warned of the consequences of his refusal to answer. At the outset of the renewed hearings the Chairman of the Committee stated:

> "As a result of our two-fold purpose [to investigate and reach determinations], particularly our function of investigation, we believe it will be necessary for you, Mr. Konigsberg, to answer our material questions or our investigation will be obstructed. We would not then as a result be able to certify you for admission."

After petitioner had refused to answer questions on Communist Party membership, the Chairman asked:

> "Mr. Konigsberg, I think you will recall that I initially advised you a failure to answer our material questions would obstruct our investigation and result in our failure to certify you. With this in mind do you wish to answer any of the questions which you heretofore up to now have refused to answer?"

At the conclusion of the proceeding another Committee member stated:

> "I would like to make this statement so that there will be no misunderstanding on the part of any court that may review this record in the future, that I feel that as a member of the Committee that the failure

---

*States* v. *Lovett,* 328 U. S. 303, especially in light of the fact that petitioner was explicitly warned in advance of the consequences of his refusal to answer. Likewise, there is no room for attributing to the Committee a surreptitious purpose to exclude Konigsberg by the device of putting to him questions which it was known in advance he would not answer, and then justifying exclusion on the premise of his refusal to respond. So far as this record shows Konigsberg was excluded only because his refusal to answer had impeded the investigation of the Committee, a ground of rejection which it is still within his power to remove.

of Mr. Konigsberg to answer the question as to whether or not he is now a member of the Communist Party is an obstruction of the function of this Committee, not a frustration if that word has been used. I think it would be an obstruction. There are phases of his moral character that we haven't been able to investigate simply because we have been stopped at this point, and I for one could not certify to the Supreme Court that he was a proper person to be admitted to practice law in this State until he answers the question about his Communist affiliation."

The record thus leaves no room for doubt on the score of "warning," and petitioner does not indeed contend to the contrary.

### III.

Finally, petitioner argues that, in any event, he was privileged not to respond to questions dealing with Communist Party membership because they unconstitutionally impinged upon rights of free speech and association protected by the Fourteenth Amendment.

At the outset we reject the view that freedom of speech and association (*N. A. A. C. P.* v. *Alabama*, 357 U. S. 449, 460), as protected by the First and Fourteenth Amendments, are "absolutes," not only in the undoubted sense that where the constitutional protection exists it must prevail, but also in the sense that the scope of that protection must be gathered solely from a literal reading of the First Amendment.[10] Throughout its history this Court

---

[10] That view, which of course cannot be reconciled with the law relating to libel, slander, misrepresentation, obscenity, perjury, false advertising, solicitation of crime, complicity by encouragement, conspiracy, and the like, is said to be compelled by the fact that the commands of the First Amendment are stated in unqualified terms: "Congress shall make no law . . . abridging the freedom of

has consistently recognized at least two ways in which constitutionally protected freedom of speech is narrower than an unlimited license to talk. On the one hand, certain forms of speech, or speech in certain contexts, has been considered outside the scope of constitutional protection.[11] See, *e. g.*, *Schenck* v. *United States,* 249 U. S. 47; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568; *Dennis* v. *United States,* 341 U. S. 494; *Beauharnais* v. *Illinois,* 343 U. S. 250; *Yates* v. *United States,* 354 U. S. 298; *Roth* v. *United States,* 354 U. S. 476. On the other hand, general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or

---

speech, or of the press; or the right of the people peaceably to assemble . . . ." But as Mr. Justice Holmes once said: "[T]he provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth." *Gompers* v. *United States,* 233 U. S. 604, 610. In this connection also compare the equally unqualified command of the Second Amendment: "the right of the people to keep and bear arms shall not be infringed." And see *United States* v. *Miller,* 307 U. S. 174.

[11] That the First Amendment immunity for speech, press and assembly has to be reconciled with valid but conflicting governmental interests was clear to Holmes, J. ("I do not doubt for a moment that by the same reasoning that would justify punishing persuasion to murder, the United States constitutionally may punish speech that produces or is intended to produce a clear and imminent danger that it will bring about forthwith certain substantive evils that the United States constitutionally may seek to prevent." *Abrams* v. *United States,* 250 U. S. 616, 627) ; to Brandeis, J. ("But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute." *Whitney* v. *California,* 274 U. S. 357, 373) ; and to Hughes, C. J. ("[T]he protection [of free speech] even as to previous restraint is not absolutely unlimited." *Near* v. *Minnesota,* 283 U. S. 697, 716.)

the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved. See, *e. g., Schneider* v. *State,* 308 U. S. 147, 161; *Cox* v. *New Hampshire,* 312 U. S. 569; *Prince* v. *Massachusetts,* 321 U. S. 158; *Kovacs* v. *Cooper,* 336 U. S. 77; *American Communications Assn.* v. *Douds,* 339 U. S. 382; *Breard* v. *Alexandria,* 341 U. S. 622. It is in the latter class of cases that this Court has always placed rules compelling disclosure of prior association as an incident of the informed exercise of a valid governmental function. *Bates* v. *Little Rock,* 361 U. S. 516, 524. Whenever, in such a context, these constitutional protections are asserted against the exercise of valid governmental powers a reconciliation must be effected, and that perforce requires an appropriate weighing of the respective interests involved. *Watkins* v. *United States,* 354 U. S. 178, 198; *N. A. A. C. P.* v. *Alabama, supra; Barenblatt* v. *United States,* 360 U. S. 109, 126–127; *Bates* v. *Little Rock, supra; Wilkinson* v. *United States,* 365 U. S. 399; *Braden* v. *United States,* 365 U. S. 431. With more particular reference to the present context of a state decision as to character qualifications, it is difficult, indeed, to imagine a view of the constitutional protections of speech and association which would automatically and without consideration of the extent of the deterrence of speech and association and of the importance of the state function, exclude all reference to prior speech or association on such issues as character, purpose, credibility, or intent. On the basis of these considerations we now judge petitioner's contentions in the present case.

Petitioner does not challenge the constitutionality of § 6064.1 of the California Business and Professions Code forbidding certification for admission to practice of those advocating the violent overthrow of government. It

would indeed be difficult to argue that a belief, firm enough to be carried over into advocacy, in the use of illegal means to change the form of the State or Federal Government is an unimportant consideration in determining the fitness of applicants for membership in a profession in whose hands so largely lies the safekeeping of this country's legal and political institutions. Cf. *Garner* v. *Board of Public Works,* 341 U. S. 716. Nor is the state interest in this respect insubstantially related to the right which California claims to inquire about Communist Party membership. This Court has long since recognized the legitimacy of a statutory finding that membership in the Communist Party is not unrelated to the danger of use for such illegal ends of powers given for limited purposes. See *American Communications Assn.* v. *Douds,* 339 U. S. 382; see also *Barenblatt* v. *United States,* 360 U. S. 109, 128–129; cf. *Wilkinson* v. *United States,* 365 U. S. 399; *Braden* v. *United States,* 365 U. S. 431.

As regards the questioning of public employees relative to Communist Party membership it has already been held that the interest in not subjecting speech and association to the deterrence of subsequent disclosure is outweighed by the State's interest in ascertaining the fitness of the employee for the post he holds, and hence that such questioning does not infringe constitutional protections. *Beilan* v. *Board of Public Education,* 357 U. S. 399; *Garner* v. *Board of Public Works,* 341 U. S. 716. With respect to this same question of Communist Party membership, we regard the State's interest in having lawyers who are devoted to the law in its broadest sense, including not only its substantive provisions, but also its procedures for orderly change, as clearly sufficient to outweigh the minimal effect upon free association occasioned by compulsory disclosure in the circumstances here presented.

There is here no likelihood that deterrence of association may result from foreseeable private action, see

*N. A. A. C. P.* v. *Alabama, supra,* at 462, for bar committee interrogations such as this are conducted in private. See Rule 58, Section X, Rules of Practice and Procedure of the Supreme Court of Illinois; cf. Cal. Bus. & Prof. Code, Rules of Procedure of the State Bar of California, Rule 8; *Anonymous* v. *Baker,* 360 U. S. 287, 291–292. Nor is there the possibility that the State may be afforded the opportunity for imposing undetectable arbitrary consequences upon protected association, see *Shelton* v. *Tucker,* 364 U. S. 479, 486, for a bar applicant's exclusion by reason of Communist Party membership is subject to judicial review, including ultimate review by this Court, should it appear that such exclusion has rested on substantive or procedural factors that do not comport with the Federal Constitution. See *Konigsberg* v. *State Bar,* 353 U. S. 252; *Schware* v. *Board of Examiners of New Mexico,* 353 U. S. 232; cf. *Wieman* v. *Updegraff,* 344 U. S. 183. In these circumstances it is difficult indeed to perceive any solid basis for a claim of unconstitutional intrusion into rights assured by the Fourteenth Amendment.

If this were all there was to petitioner's claim of a privilege to refuse to answer, we would regard the *Beilan* case as controlling. There is, however, a further aspect of the matter. In *Speiser* v. *Randall,* 357 U. S. 513, we held unconstitutional a state procedural rule that in order to obtain an exemption a taxpayer must bear the burden of proof, including both the burdens of establishing a prima facie case and of ultimate persuasion, that he did not advocate the violent overthrow of government. We said (p. 526):

> "The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be

penalized. The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens. This is especially to be feared when the complexity of the proofs and the generality of the standards applied, cf. *Dennis* v. *United States, supra,* provide but shifting sands on which the litigant must maintain his position. How can a claimant whose declaration is rejected possibly sustain the burden of proving the negative of these complex factual elements? In practical operation, therefore, this procedural device must necessarily·produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free."

It would be a sufficient answer to any suggestion of the applicability of that holding to the present proceeding to observe that *Speiser* was explicitly limited so as not to reach cases where, as here, there is no showing of an intent to penalize political beliefs. Distinguishing *Garner* v. *Board of Public Works,* 341 U. S. 716; *Gerende* v. *Board of Supervisors,* 341 U. S. 56, and *American Communications Assn.* v. *Douds,* 339 U. S. 382, the Court said (p. 527):

"In these cases . . . there was no attempt directly to control speech but rather to protect, from an evil shown to be grave, some interest clearly within the sphere of governmental concern. . . . Each case concerned a limited class of persons in or aspiring to public positions by virtue of which they could, if evilly motivated, create serious danger to the public safety. The principal aim of those statutes was not to penalize political beliefs but to deny positions to persons supposed to be dangerous because the position might be misused to the detriment of the public."

But there are also additional factors making the rationale of *Speiser* inapplicable to the case before us. There is no unequivocal indication that California in this proceeding has placed upon petitioner the burden of proof of nonadvocacy of violent overthrow, as distinguished from its other requirement of "good moral character."[12]   All it has presently required is an applicant's cooperation with the Committee's search for evidence of forbidden advocacy.   Petitioner has been denied admission to the California bar for obstructing the Committee in the performance of its necessary functions of examination and cross-examination, a ruling which indeed presupposes that the burden of producing substantial evidence on the issue of advocacy was not upon petitioner but upon the Committee.   Requiring a defendant in a civil proceeding to testify or to submit to discovery has never been thought to shift the burden of proof to him. Moreover, when this Court has allowed a State to comment upon a criminal defendant's failure to testify it has been careful to note that this does not result in placing upon him the burden of proving his innocence. *Adamson* v. *California,* 332 U. S. 46, 58.

In contrast to our knowledge with respect to the burden of establishing a prima facie case, we do not now know where, under California law, would rest the ultimate burden of persuasion on the issue of advocacy of violent overthrow.   But it is for the Supreme Court of California first to decide this question.   Only if and when that burden is placed by the State upon a bar applicant can there be drawn in question the distinction made in

---

[12] Indeed, we cannot tell whether California did so even in the earlier proceeding, since the California Supreme Court's denial of review of the Committee's original rejection of Konigsberg was without opinion, and for all we know may have rested alone on petitioner's failure to meet his state burden of proof as to "good moral character."

the *Speiser* case between penalizing statutes and those merely denying access to positions where unfitness may lead to the abuse of state-given powers or privileges. The issue is not now before us.

Thus as matters now stand, there is nothing involved here which is contrary to the reasoning of *Speiser,* for despite compelled testimony the prospective bar applicant need not "steer far wider of the unlawful zone" (357 U. S., at 526) for fear of mistaken judgment or fact finding declaring unlawful speech which is in fact protected by the Constitution. This is so as to the ultimate burden of persuasion for, notwithstanding his duty to testify, the loss resulting from a failure of proof may, for all we now know, still fall upon the State. It is likewise so as to the initial burden of production, for there is no indication in the proceeding on rehearing of petitioner's application that the Bar Committee expected petitioner to "sustain the burden of proving the negative" (357 U. S., at 526) of those complex factual elements which amount to forbidden advocacy of violent overthrow. To the contrary it is clear that the Committee had assumed the burden of proving the affirmative of those elements, but was prevented from attempting to discharge that burden by petitioner's refusal to answer relevant questions.

The judgment of the Supreme Court of California is

*Affirmed.*


MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

When this case was here before, we reversed a judgment of the California Supreme Court barring the petitioner Konigsberg from the practice of law in that State on the ground that he had failed to carry the burden of proving his good moral character and that he did not advocate forcible overthrow of the Government. In do-

ing so, we held that there was "no evidence in the record" which could rationally justify such a conclusion.[1] Upon remand, the Supreme Court of California referred the matter back to the Committee of State Bar Examiners for further hearings, at which time Konigsberg presented even more evidence of his good character. The Committee produced no evidence whatever which tended in the slightest degree to reflect upon the good character and patriotism which we had already held Konigsberg to have established. The case is therefore now before us with the prior adjudication that Konigsberg possesses the requisite good character and patriotism for admission to the Bar unimpaired.

What the Committee did do upon remand was to repeat the identical questions with regard to Konigsberg's suspected association with Communists twenty years ago that it had asked and he had refused to answer at the first series of hearings. Konigsberg again refused to answer these questions and the Committee again refused to certify him as fit for admission to the Bar, this time on the ground that his refusal to answer had obstructed the required investigation into his qualifications, a ground subsequently adopted by a majority of the Supreme Court of that State.[2]

Thus, California purports to be denying Konigsberg admission to its Bar solely on the ground that he has refused to answer questions put to him by the Committee of Bar Examiners. But when the case was here before, we observed: "There is nothing in the California statutes,

---

[1] *Konigsberg* v. *State Bar of California,* 353 U. S. 252, 273. That decision was reached on the basis of a record containing a large quantity of evidence favorable to Konigsberg and some scanty evidence arguably adverse to him.

[2] *Konigsberg* v. *State Bar of California,* 52 Cal. 2d 769, 344 P. 2d 777. Mr. Justice Traynor and Mr. Justice Peters dissented in separate opinions.

the California decisions, or even in the Rules of the Bar Committee, which has been called to our attention, that suggests that failure to answer a Bar Examiner's inquiry is, *ipso facto,* a basis for excluding an applicant from the Bar, irrespective of how overwhelming is his showing of good character or loyalty or how flimsy are the suspicions of the Bar Examiners." [3]   And we have been pointed to no subsequent California statutes, rules, regulations or court decisions which require or even permit rejection of a lawyer's application for admission solely because he refuses to answer questions.[4]  In this situation, it seems to me that Konigsberg has been rejected on a ground that is not supported by any authoritatively declared rule of law for the State of California.[5]  This alone would be

---

[3] 353 U. S., at 260–261.

[4] The total absence of any authoritative source for this rule is, in my judgment, merely accentuated by the reference in the majority opinion to the article written for the California State Bar Journal by the Secretary of the Committee of Bar Examiners.  So far as the cases relied upon in that article are even available for study, they do not in any way support the action of the Bar Committee here.

[5] Thus, it seems to me that California's rejection of Konigsberg is not supported by any "law of the land," as required by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. See *Cohen* v. *Hurley,* decided today, *post,* p. 117, at 135–150 (dissenting opinion).  As Daniel Webster argued in the *Dartmouth College* case: "Are then these acts of the legislature, which affect only particular persons and their particular privileges, laws of the land?  Let this question be answered by the text of Blackstone: 'And first, it (i. e. law) is a *rule:* not a transient sudden order from a superior, to, or concerning, a particular person; but something permanent, uniform, and universal.  Therefore, a particular act of the legislature to confiscate the goods of Titius, or to attaint him of high treason, does not enter into the idea of a municipal law: for the operation of this act is spent upon Titius only, and has no relation to the community in general; it is rather a sentence than a law.'  Lord Coke is equally decisive and emphatic.  Citing and commenting on the celebrated 29th chap. of *Magna Charta,* he says, 'no man shall be disseized, &c. unless it be by the lawful judgment, that is, verdict of equals, or by the *law*

enough for me to vote to reverse the judgment. There are other reasons, however.

Konigsberg's objection to answering questions as to whether he is or was a member of the Communist Party has, from the very beginning, been based upon the contention that the guarantees of free speech and association of the First Amendment as made controlling upon the States by the Fourteenth Amendment preclude California from denying him admission to its Bar for refusing to answer such questions. In this I think Konigsberg has been correct. California has apparently not even attempted to make actual present membership in the Communist Party a bar to the practice of law, and even if it had, I assume it would not be contended that such a law could be applied to conduct that took place before the law was passed. For such an application would, I think, not only be a clear violation of the *ex post facto* provision of the Federal Constitution, but would also constitute a bill of attainder squarely within this Court's holdings in *Cummings* v. *Missouri*[6] and *Ex parte Garland*.[7] And yet it seems to me that this record shows, beyond any shadow of a doubt, that the reason Konigsberg has been rejected is because the Committee suspects that he was at one time a member of the Communist Party.[8] I agree with the implication of the majority opinion that this is

---

*of the land,* that is, (to speak it once for all,) *by the due course and process of law.'* " (Emphasis as in source.) *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 580–581.

[6] 4 Wall. 277.

[7] 4 Wall. 333.

[8] The suspicions of the Committee doubtless relate to the period around 1941 for the Committee had heard testimony from an ex-Communist that Konigsberg had attended meetings of a Communist Party unit during that period. The unreliability of that testimony was discussed in the Court's opinion when the case was here before. See 353 U. S., at 266–268.

not an adequate ground to reject Konigsberg and that it could not be constitutionally defended.[9]

The majority avoids the otherwise unavoidable necessity of reversing the judgment below on that ground by simply refusing to look beyond the reason given by the Committee to justify Konigsberg's rejection. In this way, the majority reaches the question as to whether the Committee can constitutionally reject Konigsberg for refusing to answer questions growing out of his conjectured past membership in the Communist Party even though it could not constitutionally reject him if he did answer those questions and his answers happened to be affirmative. The majority then goes on to hold that the Committee, by virtue of its power to reject applicants who advocate the violent overthrow of the Government, can reject applicants who refuse to answer questions in any way related to that fact, even though the applicant has sworn under oath that he does not advocate violent overthrow of the Government and even though, as the majority concedes, questions as to the political associations of an applicant subject "speech and association to the deterrence of subsequent disclosure." I cannot agree with that holding.

The recognition that California has subjected "speech and association to the deterrence of subsequent disclosure" is, under the First Amendment, sufficient in itself

---

[9] Under the circumstances of this case, it seems clear to me that the action of the State of California in rejecting Konigsberg is also contrary to our decision in *Schware* v. *Board of Bar Examiners of New Mexico,* 353 U. S. 232. In that case, every member of this Court who participated in the decision expressed serious doubts with regard to the probative value of evidence as to a Bar applicant's membership in the Communist Party 15 years previous to our consideration of the case. *Id.,* at 246 (concurring opinion) 251. I cannot believe that such evidence becomes more probative when, as here, it would, if obtained, have been five years older.

to render the action of the State unconstitutional unless one subscribes to the doctrine that permits constitutionally protected rights to be "balanced" away whenever a majority of this Court thinks that a State might have interest sufficient to justify abridgment of those freedoms. As I have indicated many times before,[10] I do not subscribe to that doctrine for I believe that the First Amendment's unequivocal command that there shall be no abridgment of the rights of free speech and assembly shows that the men who drafted our Bill of Rights did all the "balancing" that was to be done in this field. The history of the First Amendment is too well known to require repeating here except to say that it certainly cannot be denied that the very object of adopting the First Amendment, as well as the other provisions of the Bill of Rights, was to put the freedoms protected there completely out of the area of any congressional control that may be attempted through the exercise of precisely those powers that are now being used to "balance" the Bill of Rights out of existence.[11] Of course, the First Amendment originally applied only to the Federal Gov-

---

[10] See, e. g., my dissenting opinions in *Braden* v. *United States,* 365 U. S. 431, 441–446; *Wilkinson* v. *United States,* 365 U. S. 399, 422–423; *Uphaus* v. *Wyman,* 364 U. S. 388, 392–393; *Barenblatt* v. *United States,* 360 U. S. 109, 140–144; *American Communications Assn.* v. *Douds,* 339 U. S. 382, 445–453.

[11] James Madison, for example, indicated clearly that he did not understand the Bill of Rights to permit *any* encroachments upon the freedoms it was designed to protect. "If they [the first ten Amendments] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an *impenetrable bulwark* against *every* assumption of power in the Legislative or Executive; they will be naturally led to resist *every* encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Congress 439 (1789). (Emphasis supplied.)

ernment and did not apply to the States. But what was originally true only of Congress is now no less true with respect to the governments of the States, unless a majority of this Court wants to overrule a large number of cases in which it has been held unequivocally that the Fourteenth Amendment made the First Amendment's provisions controlling upon the States.[12]

The Court attempts to justify its refusal to apply the plain mandate of the First Amendment in part by reference to the so-called "clear and present danger test" forcefully used by Mr. Justice Holmes and Mr. Justice Brandeis, not to narrow but to broaden the then prevailing interpretation of First Amendment freedoms.[13] I think very little can be found in anything they ever said that would provide support for the "balancing test" presently in use. Indeed, the idea of "balancing" away First Amendment freedoms appears to me to be wholly inconsistent with the view, strongly espoused by Justices Holmes and Brandeis, that the best test of truth is the power of the thought to get itself accepted in the competition of the market.[14] The "clear

---

[12] See, e. g., Minersville District v. Gobitis, 310 U. S. 586, 593; Murdock v. Pennsylvania, 319 U. S. 105, 108; Board of Education v. Barnette, 319 U. S. 624, 639; Staub v. City of Baxley, 355 U. S. 313, 321.

[13] See Schenck v. United States, 249 U. S. 47, 52, where Mr. Justice Holmes, writing for the Court, said: "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."

[14] Abrams v. United States, 250 U. S. 616, 630 (Holmes, J., dissenting). See also Gitlow v. New York, 268 U. S. 652, 673: "If in the long run the beliefs expressed in proletarian dictatorship are destined to be accepted by the dominant forces of the community, the only meaning of free speech is that they should be given their chance and

and present danger test" was urged as consistent with this view in that it protected speech in all cases except those in which danger was so imminent that there was no time for rational discussion.[15] The "balancing test," on the other hand, rests upon the notion that some ideas are so dangerous that Government need not restrict itself to contrary arguments as a means of opposing them even where there is ample time to do so. Thus here, where there is not a semblance of a "clear and present danger," and where there is more than ample time in which to combat by discussion any idea which may be involved, the majority permits the State of California to adopt measures calculated to suppress the advocacy of views about governmental affairs.

I recognize, of course, that the "clear and present danger test," though itself a great advance toward individual liberty over some previous notions of the protections afforded by the First Amendment,[16] does not go as far as my own views as to the protection that should be accorded these freedoms. I agree with Justices Holmes and Brandeis, however, that a primary purpose of the First Amendment was to insure that all ideas would be allowed to enter the "competition of the market." But I fear that the creation of "tests" by which speech is left unprotected under certain circumstances is a standing invitation to abridge it. This is nowhere more clearly indi-

---

have their way." (Holmes, J., dissenting.) And see *Whitney* v. *California*, 274 U. S. 357, 378: "Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech and assembly." (Brandeis, J., concurring.)

[15] See *Abrams* v. *United States*, 250 U. S. 616, 630–631 (dissenting opinion); *Gitlow* v. *New York*, 268 U. S. 652, 672–673 (dissenting opinion); *Whitney* v. *California*, 274 U. S. 357, 378–379 (concurring opinion).

[16] See *Bridges* v. *California*, 314 U. S. 252, 260–263.

cated than by the sudden transformation of the "clear and present danger test" in *Dennis* v. *United States*. In that case, this Court accepted Judge Learned Hand's "restatement" of the "clear and present danger test": "In each case [courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." [17]    After the "clear and present danger test" was diluted and weakened by being recast in terms of this "balancing" formula, there seems to me to be much room to doubt that Justices Holmes and Brandeis would even have recognized their test.   And the reliance upon that weakened "test" by the majority here, without even so much as an attempt to find either a "clear" or a "present" danger, is only another persuasive reason for rejecting all such "tests" and enforcing the First Amendment according to its terms.

The Court suggests that a "literal reading of the First Amendment" would be totally unreasonable because it would invalidate many widely accepted laws.   I do not know to what extent this is true.   I do not believe, for example, that it would invalidate laws resting upon the premise that where speech is an integral part of unlawful conduct that is going on at the time, the speech can be used to illustrate, emphasize and establish the unlawful conduct.[18]    On the other hand, it certainly would invalidate all laws that abridge the right of the people to discuss matters of religious or public interest, in the broadest meaning of those terms, for it is clear that a desire to protect this right was the primary purpose of the First Amendment.   Some people have argued, with much force, that the freedoms guaranteed by the First Amend-

---

[17] 183 F. 2d 201, 212; 341 U. S. 494, 510.

[18] *Roth* v. *United States*, 354 U. S. 476, 514 (dissenting opinion). See also *Labor Board* v. *Virginia Electric & Power Co.*, 314 U. S. 469; *Giboney* v. *Empire Storage Co.*, 336 U. S. 490.

ment are limited to somewhat broad areas like those.[19] But I believe this Nation's security and tranquility can best be served by giving the First Amendment the same broad construction that all Bill of Rights guarantees deserve.[20]

The danger of failing to construe the First Amendment in this manner is, I think, dramatically illustrated by the decision of this Court in *Beauharnais* v. *Illinois*,[21] one of the cases relied upon for this holding today. In that case, a majority of this Court upheld the conviction of a man whose only "crime" was the circulation of a petition to be presented to the City Council of Chicago urging that body to follow a policy of racial segregation in language that the State of Illinois chose to regard as "libelous" against Negroes. Holding that "libelous utterances" were not included in the "speech" protected against state invasion by the Due Process Clause of the Fourteenth Amendment,[22] this Court there concluded that

---

[19] See, *e. g.*, Meiklejohn, What Does the First Amendment Mean? 20 U. of Chi. L. Rev. 461, 464.

[20] Cf. *Boyd* v. *United States*, 116 U. S. 616, 635: "[C]onstitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

[21] 343 U. S. 250.

[22] The Court opinion here apparently treats the *Beauharnais* case as having decided that the *Federal* Government has power, despite the First Amendment, to pass so-called "group libel" laws. This, I think, is wholly unjustified. The *Beauharnais* opinion was written on the assumption that the protection afforded the freedoms of speech and petition against state action by the Fourteenth Amendment amounted to something less than the protection afforded these freedoms against congressional action by the First Amendment. Thus, as pointed out in my dissent in that case, the majority in *Beauharnais* never even mentioned the First Amendment but upheld

the petition which had been circulated fell within that exception and therefore outside the area of constitutionally protected speech because it made charges against the entire Negro population of this country. Thus, Beauharnais was held to have simultaneously "libelled" some fifteen million people. And by this tremendous expansion of the concept of "libel," what some people might regard as a relatively minor exception to the full protection of freedom of speech had suddenly become a vehicle which could be used to justify a return to the vicious era of the laws of seditious libel, in which the political party in power, both in England and in this country, used such laws to put its opponents in jail.[23]

Whatever may be the wisdom, however, of an approach that would reject exceptions to the plain language of the First Amendment based upon such things as "libel," "obscenity" [24] or "fighting words," [25] such is not the issue in this case. For the majority does not, and surely would not, contend that the kind of speech involved in this case—wholly related as it is to conflicting ideas about governmental affairs and policies—falls outside the protection of the First Amendment, however narrowly that Amendment may be interpreted. So the only issue presently before us is whether speech that must be well within the protection of the Amendment should be given complete protection or whether it is entitled only to such pro-

---

the state "group libel" law on the ground that it did not violate "civilized 'canons of decency,' reasonableness, etc." See 343 U. S., at 268–269. See also the dissent of Mr. Justice Jackson, at 287–305.

[23] The story of the use by the Federalists of the Alien and Sedition Acts of 1798 as a weapon to suppress the political opposition of the Jeffersonians has been graphically told in Bowers, Jefferson and Hamilton, at 362–411.

[24] See, e. g., Roth v. United States, 354 U. S. 476.

[25] See, e. g., Chaplinsky v. New Hampshire, 315 U. S. 568.

tection as is consistent in the minds of a majority of this Court with whatever interest the Government may be asserting to justify its abridgment. The Court, by stating unequivocally that there are no "absolutes" under the First Amendment, necessarily takes the position that even speech that is admittedly protected by the First Amendment is subject to the "balancing test" and that therefore no kind of speech is to be protected if the Government can assert an interest of sufficient weight to induce this Court to uphold its abridgment. In my judgment, such a sweeping denial of the existence of any inalienable right to speak undermines the very foundation upon which the First Amendment, the Bill of Rights, and, indeed, our entire structure of government rest.[26] The Founders of this Nation attempted to set up a limited government which left certain rights in the people—rights that could not be taken away without amendment of the basic charter of government. The majority's "balancing test" tells us that this is not so. It tells us that no right

---

[26] "The founders of our federal government were too close to oppressions and persecutions of the unorthodox, the unpopular, and the less influential to trust even elected representatives with unlimited powers of control over the individual. From their distrust were derived the first ten amendments, designed as a whole to 'limit and qualify the powers of Government,' to define 'cases in which the Government ought not to act, or to act only in a particular mode,' and to protect unpopular minorities from oppressive majorities. 1 Annals 437. The first of the ten amendments erected a Constitutional shelter for the people's liberties of religion, speech, press, and assembly. This amendment reflects the faith that a good society is not static but advancing, and that the fullest possible interchange of ideas and beliefs is essential to attainment of this goal. The proponents of the First Amendment, committed to this faith, were determined that every American should possess an unrestrained freedom to express his views, however odious they might be to vested interests whose power they might challenge." *Feldman* v. *United States*, 322 U. S. 487, 501 (dissenting opinion).

to think, speak or publish exists in the people that cannot be taken away if the Government finds it sufficiently imperative or expedient to do so. Thus, the "balancing test" turns our "Government of the people, by the people and for the people" into a government over the people.

I cannot believe that this Court would adhere to the "balancing test" to the limit of its logic. Since that "test" denies that any speech, publication or petition has an "absolute" right to protection under the First Amendment, strict adherence to it would necessarily mean that there would be only a conditional right, not a complete right, for any American to express his views to his neighbors—or for his neighbors to hear those views. In other words, not even a candidate for public office, high or low, would have an "absolute" right to speak in behalf of his candidacy, no newspaper would have an "absolute" right to print its opinion on public governmental affairs, and the American people would have no "absolute" right to hear such discussions. All of these rights would be dependent upon the accuracy of the scales upon which this Court weighs the respective interests of the Government and the people. It therefore seems to me that the Court's "absolute" statement that there are no "absolutes" under the First Amendment must be an exaggeration of its own views.

These examples also serve to illustrate the difference between the sort of "balancing" that the majority has been doing and the sort of "balancing" that was intended when that concept was first accepted as a method for insuring the complete protection of First Amendment freedoms even against purely incidental or inadvertent consequences. The term came into use chiefly as a result of cases in which the power of municipalities to keep their streets open for normal traffic was attacked by groups wishing to use those streets for religious or polit-

ical purposes.[27]   When those cases came before this Court, we did not treat the issue posed by them as one primarily involving First Amendment rights.   Recognizing instead that public streets are avenues of travel which must be kept open for that purpose, we upheld various city ordinances designed to prevent unnecessary noises and congestions that disrupt the normal and necessary flow of traffic.   In doing so, however, we recognized that the enforcement of even these ordinances, which attempted no regulation at all of the content of speech and which were neither openly nor surreptitiously aimed at speech, could bring about an "incidental" abridgment of speech.   So we went on to point out that even ordinances directed at and regulating only conduct might be invalidated if, after "weighing" the reasons for regulating the particular conduct, we found them insufficient to justify diminishing "the exercise of rights so vital to the maintenance of democratic institutions" as those of the First Amendment.[28]

But those cases never intimated that we would uphold as constitutional an ordinance which purported to rest upon the power of a city to regulate traffic but which was aimed at speech or attempted to regulate the content of speech.   None of them held, nor could they constitutionally have held, that a person rightfully walking or riding along the streets and talking in a normal way could have his views controlled, licensed or penalized in any way by the city—for that would be a direct abridgment of speech itself.   Those cases have only begun to take on that meaning by being relied upon, again and again as they

---

[27] Typical of such cases are those referred to by the majority in its opinion here: *Schneider* v. *State*, 308 U. S. 147; *Cox* v. *New Hampshire*, 312 U. S. 569; *Prince* v. *Massachusetts*, 321 U. S. 158; *Kovacs* v. *Cooper*, 336 U. S. 77.

[28] *Schneider* v. *State*, 308 U. S. 147, 161.

are here, to justify the application of the "balancing test" to governmental action that is aimed at speech and depends for its application upon the content of speech. Thus, those cases have been used to support decisions upholding such obviously antispeech actions on the part of government as those involved in *American Communications Assn.* v. *Douds*[29] and *Dennis* v. *United States.*[30] And the use being made of those cases here must be considered as falling squarely within that class.[31]

The Court seeks to bring this case under the authority of the street-regulation cases and to defend its use of the "balancing test" on the ground that California is attempting only to exercise its permissible power to regulate its Bar and that any effect its action may have upon speech is purely "incidental." But I cannot agree that the questions asked Konigsberg with regard to his suspected membership in the Communist Party had nothing more than an "incidental" effect upon his freedom of speech and association. Why does the Committee of Bar Examiners ask a bar applicant whether he is or has been a member of the Communist Party? The avowed purpose of such questioning is to permit the Committee to deny applicants admission to the Bar if they "advocate" forcible overthrow of the Government. Indeed, that is precisely the ground upon which the majority is here upholding the Committee's right to ask Konigsberg these questions. I realize that there has been considerable talk, even in the opinions of this Court, to the effect that "advocacy" is not "speech." But with the highest respect for those who believe that there is such a distinction, I cannot agree with it. For this reason, I think the conclusion is inescapable that this case presents the question of the consti-

---

[29] 339 U. S. 382, especially at 398–400.

[30] 341 U. S. 494, especially at 508–509.

[31] See also the discussion of these street-regulation cases in my dissenting opinion in *Barenblatt* v. *United States,* 360 U. S. 109, 141–142.

tutionality of action by the State of California designed to control the content of speech. As such, it is a "direct," and not an "incidental" abridgment of speech. Indeed, if the characterization "incidental" were appropriate here, it would be difficult to imagine what would constitute a "direct" abridgment of speech. The use of the "balancing test" under these circumstances thus permits California directly to abridge speech in explicit contradiction to the plain mandate of the First Amendment.

But even if I thought the majority was correct in its view that "balancing" is proper in this case, I could not agree with its decision. In the first place, I think that the decision here is unduly restrictive upon individual liberty even under the penurious "balancing test." The majority describes the State's interest which is here to be "balanced" against the interest in protecting the freedoms of speech and association as an interest in "having lawyers who are devoted to the law in its broadest sense, including not only its substantive provisions, but also its procedures for orderly change." But is that an accurate statement of the interest of the State that is really at stake here? Konigsberg has stated unequivocally that he never has, does not now, and never will advocate the overthrow of the Government of this country by unconstitutional means, and we held when the case was here before that his evidence was sufficient to establish that fact. Since the Committee has introduced no evidence at any subsequent hearing that would lead to a contrary conclusion, the fact remains established.[32] So the issue in

---

[32] The majority places some stress upon the fact that the Committee did not have independent investigatory resources with which to seek further evidence. In view of the complete reliance upon this decision to justify the use of an identical procedure in *In re Anastaplo*, decided today, *post*, p. 82, where the bar admission committee not only had investigatory resources but also utilized them to the fullest, this fact must be of little "weight" in the constitutional "balance."

this case is not, as the majority's statement of the State's interest would seem to indicate, whether a person who advocates the overthrow of existing government by force must be admitted to the practice of law. All we really have on the State's side of the scales is its desire to know whether Konigsberg was ever a member of the Communist Party.

The real lack of value of that information to the State is, to my mind, clearly shown by the fact that the State has not even attempted to make membership in the Communist Party a ground for disqualification from the Bar. Indeed, if the State's only real interest was, as the majority maintains, in having good men for its Bar, how could it have rejected Konigsberg, who, undeniably and as this Court has already held, has provided overwhelming evidence of his good character? Our former decision, which I still regard as resting on what is basically just good common sense, was that a man does not have to tell all about his previous beliefs and associations in order to establish his good character and loyalty.

When the majority turns to the interest on the other side of the scale, it admits that its decision is likely to have adverse effects upon free association caused by compulsory disclosures, but then goes on to say that those adverse effects will be "minimal" here, first, because Bar admission interrogations are private and, secondly, because the decisions of Bar admission committees are subject to judicial review. As to the first ground, the Court simply ignores the fact that California law does not require its Committee to treat information given it as confidential.[33] And besides, it taxes credulity to sup-

---

[33] In this regard, the situation is identical to that invalidated as unconstitutional by our decision in *Shelton* v. *Tucker*, 364 U. S. 479. Indeed, the absence of such a requirement was there stressed as an important part of the ground upon which that decision rested. *Id.*, at 486.

pose that questions asked an applicant and answers given by him in the highly emotional area of communism would not rapidly leak out to the great injury of an applicant—regardless of what the facts of his particular case may happen to be. As to the second ground given, the Court fails to take into account the fact that judicial review widens the publicity of the questions and answers and thus tends further to undercut its first ground. At the same time, such review, as is demonstrated by this and the companion case decided today,[34] provides small hope that an applicant will be afforded relief against stubborn efforts to destroy him arbitrarily by innuendoes that will subject him to lasting suspicions. But even if I thought the Court was correct in its beliefs that the interrogation of a Bar applicant would be kept confidential and that judicial review is adequate to prevent arbitrary exclusions from the Bar, I could not accept its conclusion that the First Amendment rights involved in this case are "minimal."

The interest in free association at stake here is not merely the personal interest of petitioner in being free from burdens that may be imposed upon him for his past beliefs and associations. It is the interest of all the people in having a society in which no one is intimidated with respect to his beliefs or associations. It seems plain to me that the inevitable effect of the majority's decision is to condone a practice that will have a substantial deterrent effect upon the associations entered into by anyone who may want to become a lawyer in California. If every person who wants to be a lawyer is to be required to account for his associations as a prerequisite to admission into the practice of law, the only safe course for those desiring admission would seem to be scrupulously to avoid

---

[34] *In re Anastaplo, supra.* See also the discussion in my dissenting opinion in that case, especially at pp. 108–112.

association with any organization that advocates anything at all somebody might possibly be against, including groups whose activities are constitutionally protected under even the most restricted notion of the First Amendment.[35]   And, in the currently prevailing atmosphere in this country, I can think of few organizations active in favor of civil liberties that are not highly controversial.[36] In addition, it seems equally clear that anyone who had already associated himself with an organization active in favor of civil liberties before he developed an interest in the law, would, after this case, be discouraged from spending the large amounts of time and money necessary to obtain a legal education in the hope that he could practice law in California.

Thus, in my view, the majority has reached its decision here against the freedoms of the First Amendment by a fundamental misapplication of its own currently, but I hope only temporarily, prevailing "balancing" test.   The interest of the Committee in satisfying its curiosity with respect to Konigsberg's "possible" membership in the Communist Party two decades ago has been inflated out of all proportion to its real value—the vast interest of the public in maintaining unabridged the basic freedoms of speech, press and assembly has been paid little if anything more than lip service—and important constitutional rights have once again been "balanced" away. This, of course, is an ever-present danger of the "balanc-

---

[35] The situation here is thus identical to that in *Speiser* v. *Randall,* where the Court expressly recognized the danger to protected associations.  See 357 U. S. 513, 526.

[36] Cf. *Shelton* v. *Tucker, supra,* at 486, n. 7, where we took note of testimony that efforts were being made to remove from a school system all teachers who supported such organizations as the American Civil Liberties Union, the Urban League, the American Association of University Professors, and the Women's Emergency Committee to Open Our Schools.

ing test" for the application of such a test is necessarily tied to the emphasis particular judges give to competing societal values. Judges, like everyone else, vary tremendously in their choice of values. This is perfectly natural and, indeed, unavoidable. But it is neither natural nor unavoidable in this country for the fundamental rights of the people to be dependent upon the different emphasis different judges put upon different values at different times. For those rights, particularly the First Amendment rights involved here, were unequivocally set out by the Founders in our Bill of Rights in the very plainest of language, and they should not be diluted by "tests" that obliterate them whenever particular judges think values they most highly cherish outweigh the values most highly cherished by the Founders.

Moreover, it seems to me that the "balancing test" is here being applied to cut the heart out of one of the very few liberty-protecting decisions that this Court has rendered in the last decade. *Speiser* v. *Randall* [37] struck down, as a violation of the Federal Constitution, a state law which denied tax exemptions to veterans who refused to sign an oath that they did not advocate "the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means . . . ." [38] The case arose when certain veterans insisted upon their right to the exemptions without signing the oath. The California Supreme Court rejected the veterans' constitutional contention that the state law violated due process by placing the burden of proof upon the taxpayer to prove that he did not advocate violent overthrow of the Government. This Court reversed, with only

---

[37] 357 U. S. 513.

[38] Section 32 of the California Revenue and Taxation Code. This section was set out in full in the majority opinion in *Speiser*. 357 U. S., at 516–517, n. 2.

one Justice dissenting, on the ground that the necessary effect of such an imposition of the burden of proof "can only result in a deterrence of speech which the Constitution makes free." [39]   Indeed, the majority opinion in the *Speiser* case distinguished the very cases upon which the majority here is relying on the ground that "the oaths required in those cases performed a very different function from the declaration in issue here.   In the earlier cases it appears that the loyalty oath, once signed, became conclusive evidence of the facts attested so far as the right to office was concerned.   If the person took the oath he retained his position.   The oath was not part of a device to shift to the officeholder the burden of proving his right to retain his position." [40]   But that is precisely what is happening here.   For, even though Konigsberg has taken an oath that he does not advocate the violent overthrow of the Government, the Committee has persisted in the view that he has not as yet demonstrated his right to admission to the Bar.   If that does not amount to the sort of shifting of the burden of proof that is proscribed by *Speiser*, I do not know what would.

The situation in the present case is closely analogous to that condemned in the *Speiser* case and, indeed, the major factual difference between the two cases tends to make this case an even stronger one.   Here, as in *Speiser*, the State requires an oath that the person involved does not advocate violent overthrow of the Government.   Here, as there, the taking of the oath is not conclusive of the rights of the person involved.   And here, as there, contrary to the implications in the majority opinion, I think it clear that the State places upon each applicant for admission to the Bar the burden of proving that he does

[39] 357 U. S., at 526.

[40] *Id.*, at 528.   The cases so distinguished were *Garner* v. *Board of Public Works*, 341 U. S. 716; *Gerende* v. *Board of Supervisors*, 341 U. S. 56, and *American Communications Assn.* v. *Douds*, 339 U. S. 382.

not advocate the violent overthrow of the Government. There is one difference between the two cases, for here Konigsberg agreed to take the oath required and he refused to answer only when the State insisted upon more. Surely he cannot be penalized for his greater willingness to cooperate with the State.

The majority also suggests that the *Speiser* case may be distinguishable because it involved merely the power of the State to impose a penalty, by way of a heavier tax burden, upon a person who refused to take an oath, while this case involves the power of the State to determine the qualifications a person must have to be admitted to the Bar—a position of importance to the public. This distinction seems to me to be little more than a play on words. Speiser had the burden of proving that he did not advocate the overthrow of the Government and, upon his refusal to satisfy this burden, he was forced to pay additional taxes as a penalty. Konigsberg has the burden of proving that he does not advocate the violent overthrow of the Government and, upon his supposed failure to meet this burden, he is being denied an opportunity to practice the profession for which he has expended much time and money to prepare himself. So far as I am concerned the consequences to Konigsberg, whether considered from a financial standpoint, a social standpoint, or any other standpoint I can think of, constitute a more serious "penalty" than that imposed upon Speiser.

In my judgment this case must take its place in the ever-lengthening line of cases in which individual liberty to think, speak, write, associate and petition is being abridged in a manner precisely contrary to the explicit commands of the First Amendment.[41] And I believe the

---

[41] This line has already been considerably lengthened during this very Term of Court. See, *e. g., Uphaus* v. *Wyman,* 364 U. S. 388; *Times Film Corp.* v. *City of Chicago,* 365 U. S. 43; *Wilkinson* v. *United States,* 365 U. S. 399; *Braden* v. *United States,* 365 U. S. 431.

abridgment of liberty here, as in most of the other cases in that line, is based upon nothing more than a fear that the American people can be alienated from their allegiance to our form of government by the talk of zealots for a form of government that is hostile to everything for which this country now stands or ever has stood. I think this fear is groundless for I believe that the loyalty and patriotism of the American people toward our own free way of life are too deeply rooted to be shaken by mere talk or argument from people who are wedded to totalitarian forms of government. It was this kind of faith in the American people that brought about the adoption of the First Amendment, which was expressly designed to let people say what they wanted to about government—even against government if they were so inclined. The idea underlying this then revolutionary idea of freedom was that the Constitution had set up a government so favorable to individual liberty that arguments against that government would fall harmless at the feet of a satisfied and happy citizenship. Thomas Jefferson voiced this idea with simple eloquence on the occasion of his first inauguration as President of the United States: "If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it." [42]

In the main, this is the philosophy under which this country has lived and prospered since its creation. There have, however, been two notable exceptions, the first being the period of the short-lived and unlamented alien and sedition laws of the late 1700's, and the other

---

[42] Thomas Jefferson, First Inaugural Address, March 4, 1801. This address is reprinted in Jones, Primer of Intellectual Freedom 142, 143 (Harvard University Press, 1949).

being the period since the beginning of the "cold war" shortly after the close of World War II, in which there has been a widespread fear of an imagined overwhelming persuasiveness in Communist arguments. The most commonly offered justification for the liberty-stifling measures that have characterized this latter period is that the Communists do not themselves believe in the freedoms of speech, press and assembly so they should not be allowed to take advantage of the freedoms our Constitution provides. But, as illustrated by this and many other cases, the effect of repressive laws and inquisitions of this kind cannot be and is not limited to Communists.[43] Moreover, the fact that Communists practice repression of these freedoms is, in my judgment, the last reason in the world that we should do so. We do not have to imitate the Communists in order to survive. Our Bill of Rights placed our survival upon a firmer ground—that of freedom, not repression.

Nothing in this record shows that Konigsberg has ever been guilty of any conduct that threatens our safety. Quite the contrary, the record indicates that we are fortunate to have men like him in this country for it shows that Konigsberg is a man of firm convictions who has stood up and supported this country's freedom in peace and in war. The writings that the record shows he has published constitute vehement protests against the idea

---

[43] "Centuries of experience testify that laws aimed at one political or religious group, however rational these laws may be in their beginnings, generate hatreds and prejudices which rapidly spread beyond control. Too often it is fear which inspires such passions, and nothing is more reckless or contagious. In the resulting hysteria, popular indignation tars with the same brush all those who have ever been associated with any member of the group under attack or who hold a view which, though supported by revered Americans as essential to democracy, has been adopted by that group for its own purposes." *American Communications Assn.* v. *Douds,* 339 U. S. 382, 448–449 (dissenting opinion).

of overthrowing this Government by force. No witness could be found throughout the long years of this inquisition who could say, or even who would say, that Konigsberg has ever raised his voice or his hand against his country. He is, therefore, but another victim of the prevailing fashion of destroying men for the views it is suspected they might entertain.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE joins, dissenting.

This judgment must be reversed even if we assume with Mr. Justice Traynor in his dissent in the California Supreme Court, 52 Cal. 2d 769, 774, at 776, 344 P. 2d 777, 780, at 781–782, that "a question as to present or past membership in [the Communist Party] is relevant to the issue of possible criminal advocacy and hence to [Konigsberg's] qualifications." The Committee did not come forward, in the proceeding we passed upon in 353 U. S. 252, nor in the subsequent proceeding, with evidence to show that Konigsberg unlawfully advocated the overthrow of the Government. Under our decision in *Speiser* v. *Randall,* 357 U. S. 513, the Fourteenth Amendment therefore protects Konigsberg from being denied admission to the Bar for his refusal to answer the questions. In *Speiser* we held that ". . . when the constitutional right to speak is sought to be deterred by a State's general taxing program due process demands that the speech be unencumbered until the State comes forward with sufficient proof to justify its inhibition." 357 U. S., pp. 528–529. "There may be differences of degree," Mr. Justice Traynor said, "in the public interest in the fitness of the applicants for tax exemption and for admission to the Bar"; yet, as to' the latter also, "Such a procedure is logically dictated by *Speiser* . . . ." 52 Cal. 2d, p. 776, 344 P. 2d, p. 782. And unless mere whimsy governs this Court's decisions in situations im-

possible rationally to distinguish, such a procedure is indeed constitutionally required here. The same reasons apply. For Mr. Justice Traynor was entirely right in saying: "Whatever its relevancy [the question as to past or present Party membership] in a particular context, . . . it is an extraordinary variant of the usual inquiry into crime, for the attendant burden of proof upon any one under question poses the immediate threat of prior restraint upon the free speech of all applicants. The possibility of inquiry into their speech, the heavy burden upon them to establish its innocence, and the evil repercussions of inquiry despite innocence, would constrain them to speak their minds so noncommittally that no one could ever mistake their innocuous words for advocacy. This grave danger to freedom of speech could be averted without loss to legitimate investigation by shifting the burden to the examiners. Confronted with a prima facie case, an applicant would then be obliged to rebut it." *Id.*, p. 776, 344 P. 2d, p. 782.

The Court admits the complete absence of any such predicate by the Committee for its questions. The Court attempts to distinguish the situations in order to escape the controlling authority of *Speiser*. The speciousness of its reasoning is exposed in Mr. Justice Black's dissent. I would reverse.