**KTSP–TAFT TELEVISION AND RADIO COMPANY, et al., Plaintiffs,**

v.

**The ARIZONA STATE LOTTERY COMMISSION, et al., Defendants.**

**No. CIV 85–1095 PHX EHC.**

United States District Court, D. Arizona, Phoenix Division.

July 25, 1986.

Lawrence A. Hammond, Colin F. Campbell, Phoenix, Ariz., for plaintiff KTSP.

William J. Reckling, Phoenix, Ariz., for plaintiff KPNX.

Logan T. Johnston, Daniel D. Maynard, Phoenix, Ariz., for defendant Arizona Television.

J. David Rich, Phoenix, Ariz., for defendant Arizona State Lottery.

## MEMORANDUM AND ORDER

CARROLL, District Judge.

Plaintiff KTSP–Taft Television and Radio Company, Inc., an Ohio corporation (Channel 10), filed this action July 8, 1986 against defendants Arizona Lottery Commission (Commission), Charles Buri, the Commission's executive director (Director) and Arizona Television Co. (Channel 3), an Arizona corporation. Channel 10 seeks a determination of the constitutionality of a Commission policy limiting live broadcast privileges of the weekly Pick drawing to those stations contracting with the Commission. An injunction allowing any television broadcaster, without the necessity of a contract, to televise live the weekly drawing, is also sought.

For the reasons set forth in this Memorandum and Order, the the application for preliminary injunction is denied.

## THE PARTIES

*Plaintiffs:*

Plaintiff KTSP–Taft Television and Radio Company is an Ohio corporation quali-fied to do business in Arizona. It is a television broadcaster and owner of KTSP–TV, Channel 10, the Columbia Broadcasting System affiliate in Phoenix, Arizona.

Plaintiff-intervenor KPNX Broadcasting Company is an Arizona corporation. KPNX is a television broadcaster and is the owner of KPNX–TV, Channel 12, the National Broadcasting Company affiliate in Phoenix, Arizona.

*Defendants*

The Arizona State Lottery Commission is a state agency established pursuant to statute. Arizona voters, following a public initiative, at a general election on November 4, 1980, approved the establishment of a state lottery and adopted statutes generally governing the operation of the Lottery. The governing statutes are to be found at Title 5, Arizona Revised Statutes, Chapter 5. Title 5 addresses the conduct of amusements and sports in Arizona.

Pursuant to the voter's action an Arizona State Lottery Commission came into being and an executive director was appointed. The primary duty of the Commission is "to establish and operate [a] lottery to produce the maximum amount of net revenue" for the state. Ariz.Rev.Stat.Ann. sec. 5–504(B). It is the responsibility of the Director to "exercise immediate supervision over the lottery," Ariz.Rev.Stat.Ann. sec. 5–503(A), and "promulgate rules," Ariz.Rev.Stat.Ann. sec. 5–504(B), necessary to achieving that maximum profit. The rules to be promulgated by the Director may include, *inter alia,* the types of games to be conducted, the method of selecting the winner of the game, the frequency of drawings, and other matters necessary to the efficient and economical operation of the lottery. Ariz.Rev.Stat.Ann. sec. 5–504(B). Subsection 5–504(B)(7)(a) mandates that "all drawings shall be held in public."

Charles Buri is the Commission's executive director and is sued only in his official capacity. The Director is empowered to "[c]ontract to effectuate the purposes of [the enabling act]." Ariz.Rev.Stat.Ann. sec. 5–509(A)(2).

Defendant Arizona Television Company is an Arizona Corporation. It owns KTVK–TV, Channel 3, the American Broadcasting Companies affiliate in Phoenix, Arizona.[1]

## DISMISSAL AND ABSTENTION

An identical action, with Channel 10 as the only plaintiff, was originally brought in the state court. There it was dismissed for failure to exhaust state administrative remedies. The state trial court held that Channel 10 should first attempt to secure its desired relief through the Lottery Commission. *KTSP-Taft Television and Radio Company, Inc. v. Arizona State Lottery Comm'n*, No. C 584852 (Sup.Ct. Maricopa County, Arizona July 8, 1986).

■ Relying upon the existence of this state proceeding and the potential for state appellate review, Channel 3 has moved to dismiss the federal court action on the doctrine enunciated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and made applicable to civil proceedings by *Huffman v. Pursue Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). *Younger* has been limited in its application to suits "which seek to enjoin state judicial proceedings." *Fair Assessment in Real Estate Ass'n Inc. v. McNary*, 454 U.S. 100, 111, 102 S.Ct. 177, 183, 70 L.Ed.2d 271 (1981) (in asserting this limitation of the *Younger* doctrine the Court further announced this was "a limitation which [it did] not abandon here"); *see also Midkiff v. Tom*, 702 F.2d 788, 789–90 n. 1 (9th Cir.1983), *rev'd on other grounds sub nom. Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). The Supreme Court, though reversing the circuit court as to the actual dispute in *Midkiff,* affirmed the determination of both the circuit court and trial court that abstention was not appropriate under any doctrine extant in that area of law. 467

U.S. at 236–39, 104 S.Ct. at 2327–29. The pending suit does not seek to enjoin state judicial proceedings; it seeks affirmative relief for plaintiffs in a federal court, allowing them unfettered access to the drawing for The Pick.

■ Although defendants did not raise the doctrine, plaintiffs have also addressed the appropriateness of abstention under the doctrine enunciated in *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Count One of the Complaint, alleges a violation of Arizona Revised Statute sec. 5–504(B)(7)(a), which requires that "[a]ll lottery drawings be held in public." This statute has not been construed by state courts. While it is susceptible to an interpretation that the drawing is not being held in public, which would dispose of this case, such an interpretation is unlikely. Any other interpretation would leave the federal and state constitutional claims viable, thus making abstention inappropriate. *Cf. County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). Further, since abstention is the exception rather than the rule, *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976), and would, in all likelihood, merely result in delay rather than resolution, *cf. Procunier v. Martinez*, 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1976), abstention is not appropriate under the *Pullman* doctrine.

■ Plaintiffs also proffered, during the preliminary injunction hearing (July 15, 1986), a form of order certifying to the Arizona Supreme Court the question whether the subject broadcast contract is violative of Ariz.Rev.Stat. sec. 5–504(B)(7)(a). The rationale discussed *supra* as to the *Pullman* doctrine—that an answer to that question would not dispose of

---

1. May Broadcasting Company, KGUN–TV, Channel 9, Tucson, Arizona, is not a party to this action. Its application to be heard as amicus curiae was denied since a memorandum was not presented and its status is that of an interested party in these proceedings.

Defendants argue this action should be dismissed on grounds that an indispensable party has not been joined: Channel 9. The absence of Channel 9 will not prejudice either it or any party to this action, its interests being well represented by Channel 3.

this controversy and only result in delay—applies with equal force to a suggestion for certification.

■ Defendant Lottery has urged that the case be dismissed because it violates the Eleventh Amendment to the United States Constitution. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). Defendant's argument misconstrues the question before this Court. Resolution of this case is dependent upon giving effect to federal constitutional guarantees. Even if a different outcome were reached it would not be grounded upon enforcing state statutes.

### LOTTERY GAME

In fulfilling their duty "to establish and operate [a] lottery to produce the maximum amount of net revenue," the Commission and Director have caused to be operated, among the several types of games the Commission conducts, a game known as "The Pick" (Pick). This game, first initiated in October 1984, consists of a once-a-week drawing of six numbers selected from the pool of numbers one to thirty-six. The weekly drawings currently are held each Saturday night at ten o'clock p.m.

Contestants participate by purchasing tickets during the week prior to the game which indicate thereon the numbers the contestant either selects or has randomly selected by the Lottery's computer, a so-called "Quick Pick." A computer keeps tally of the tickets purchased and numbers selected. The size of the jackpot for each week is determined by the number of tickets purchased. If no contestant successfully predicts the six numbers drawn the jackpot continues to cumulate for the next week's drawing. In its nearly two years of operation there have been a number of weeks where the jackpot is derived only from the tickets sold that particular week. Those jackpots have ranged in approximate size from three hundred thousand to one million dollars, depending on the particular volume of sales that week. At other times the jackpot has accumulated for several weeks, totalling on more than seven million dollars on one occasion. The operation of the Pick game has been continuous since its commencement in October 1984.

### LOTTERY BROADCAST CONTRACT

In August 1984 the Director invited Arizona television broadcasters to submit bids for the right to televise the weekly drawings of the Pick game for the period October 1, 1984 to December 31, 1985. In September 1985 a second bid invitation was extended; this time for the period January 1, 1986 to December 31, 1986.

For both bid periods the successful applicant was a joint bid from KTVK–TV Channel 3, a Phoenix station, and KGUN–TV Channel 9, a Tucson station. For the first bid period the only other station submitting a proposal was Channel 40 in Tucson. For the second period Channel 7, from Prescott, and Channel 10, a Phoenix station, were also bidders in addition to Channels 3 and 9. Though both Channel 3 and Channel 9 are affiliated with the American Broadcasting Companies, they are separate entities with independent ownership and control.

As successful bidders for the television rights to the Pick games, Channels 3 and 9 have been the exclusive broadcasters of the Pick game throughout its existence.[2] The drawing takes place on a set at Channel 3's Phoenix studios. The set utilizes logos for Channels 3 and 9 and a TV personality employed by Channel 3 serves as master of ceremonies. The drawings are filmed by Channel 3 personnel and broadcast live, during the ninety seconds preceding the

---

**2.** Prior to the filing of this action Channels 3 and 10 assumed they were bidding on an exclusive right to broadcast the Pick drawing. In fact, the bid specifications did not call for the award of an exclusive contract and the contract itself does not include an exclusivity provision.

The Director has only awarded one annual contract for each of the two years, with the consequent result that the contract awarded has a de facto exclusive status.

telecast of the Saturday evening ten o'clock news on Channels 3 and 9.

The drawings are open to the public, including any media representative. During the first two weeks of the Pick Channel 3 maintained a receptionist at the front entrance to its studios, should anyone have wished to witness the drawing in person. Because of limited interest that practice ceased. To currently obtain entry to the drawing a person must go to the rear entrance of the studios, push a buzzer and be admitted by an on-duty engineer.

The Commission stated during the preliminary injunction hearing it will allow any television station in the state to broadcast the drawing if such station will provide to the Commission the same contractual considerations now afforded by Channels 3 and 9's contract. The Commission has also offered to allow plaintiff stations or any other television broadcasters to have a camera, transmission apparatus and personnel present in the studio during the drawing, and to broadcast the winning numbers as they appear. However, even though the television announcement could be simultaneous to the drawing, the actual drawing could not be filmed and televised by these stations.

The consideration now provided by Channels 3 and 9, and set out in the Pick broadcast contract, consist of providing a set, a master of ceremonies, ninety seconds of airtime weekly for the actual drawing, replay of the drawing segment in its entirety during late Saturday programming, a minimum of twenty-one weekly promotional television announcements regarding the Pick game, weekly advertisement of The Pick and its telecast in TV Guide, and a repeat of the winning numbers during the newscast following the Pick broadcast. Defendants estimate that these considerations have an approximate value of $934,-000. Channels 3 and 9 have met their contractual obligations.

The annual Pick revenues are estimated at approximately $37,000,000.

### ARGUMENTS

Relying primarily on the First Amendment to the United States Constitution, plaintiffs argue they have an absolute right to broadcast the Pick drawing live, in its entirety. The First Amendment is implicated, plaintiffs urge, by the governmental, public and newsworthy nature of the drawing.[3] Though focusing on the First Amendment, plaintiffs also rely on other federal and state constitutional provisions and statutes to argue that the Commission is required to provide all television stations with an equal-free-opportunity to televise the drawings live on such occasions as they choose to do so.

Defendants argue the drawing is simply an entertainment aspect of a state revenue-generating activity, more commercial than governmental in nature. As such, they contend, the award a contract for its broadcast is neither arbitrary or capricious in its award.

Even if the First Amendment is implicated as regards the drawing, defendants ar-

---

**3.** In brief, the substantive counts of the complaint filed by Channel 10 allege that an exclusive broadcast agreement violates:

(1) Ariz.Rev.Stat.Ann. sec. 5–504(B)(7)(a), which mandates that all drawings of the Lottery "be held in public";

(2) Article 2, section six of the Arizona Constitution, which grants to every person the right to "freely speak, write, and publish on all subjects";

(3) Article 2, section thirteen of the Arizona Constitution, which guarantees that "[n]o law shall be enacted granting to any ... corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all ... corporations";

(4) First Amendment guarantees of freedom of speech and press and First and Fifth Amendment guarantees of equal access to public forums; and

(5) 28 U.S.C. sec. 1983 in that it deprives the plaintiffs of the rights, privileges and immunities secured by the laws and Constitution of the United States.

A sixth substantive count, attacking on Arizona statutory grounds the assignment of television broadcast rights to a ten-week Thursday night instant-winner game, has been mooted by a pooled coverage arrangement arrived at by the parties subsequent to the filing of the action.

gue that the relevant constitutional guarantees are not absolute but must instead be balanced against the state's own compelling interest in having the Pick broadcast at the same time each week, over one or more identified stations, which is considered essential if the Lottery is to generate the "maximum amount of net revenue." [4]

## DISCUSSION

■ Plaintiffs' invocation of the First Amendment is not dispositive of this dispute. Even though among constitutional guarantees the First Amendment is afforded special status, *Schneider v. State of New Jersey*, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939), the rights embodied therein are not absolute. *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information."); *see also Press-Enterprise Co. v. Superior Court*, —— U.S. ——, 106 S.Ct. 2735, 2741, 92 L.Ed.2d 1 (1986) ("even when a right of [press] access attaches, it is not absolute."); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581, 103 S.Ct. 1365, 1369, 75 L.Ed.2d 295 (1983) ("Clearly, the First Amendment does not prohibit all regulation of the press."); *Konigsberg v. State Bar*, 366 U.S. 36, 50–51, 81 S.Ct. 997, 1006–07, 6 L.Ed.2d 105 (1961) ("general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law that the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests"); *Whitney v. People*, 274 U.S. 357, 373, 47 S.Ct. 641, 647, 71 L.Ed. 1095 (1927)

("although the rights of free speech and assembly are fundamental, they are not in their nature absolute"); *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1918) ("But the character of every act depends upon the circumstances in which it is done.").

■ The fact that a state action may occur in a context which invokes consideration of First Amendment guarantees does not presumptively invalidate the state action. *See Konigsberg v. State Bar*, 366 U.S. at 49, 81 S.Ct. at 1005. The right of access, both for the general public and members of the media, may be limited where a particular environment, *Procunier v. Martinez*, 416 U.S. 396, 409–10, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974); *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969); an overriding governmental interest, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980); or more substantial constitutional interests are at stake, *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); if the state entity is functioning in a commercially competitive capacity, *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974); *Gannet Satellite Info. Network, Inc. v. Metropolitan Transp. Auth.*, 745 F.2d 767, 775 (2d Cir. 1984); *Post Newsweek Stations—Connecticut v. Travelers Ins. Co.*, 510 F.Supp. 81, 85 (D.Conn.1981), or an equitable consideration exists, *WPIX v. League of Women Voters*, 595 F.Supp. 1484, 1494 (S.D.N.Y. 1984).

■ Regardless of the context, First Amendment claims must be assessed on a

---

4. Necessary to achieving that goal, the Director contends, is the regular broadcast of the Pick drawing and the publicity attendant to those broadcasts. To wit: the drawing must be telecast every week, at the same time, from a known source or sources, regardless of the amount of the jackpot, to enhance public interest in the Lottery and thus motivate persons to purchase Pick tickets.

Plaintiffs stated at the Preliminary Injunction hearing that they would, for the remainder of the current contract period, stipulate to broadcasting The Pick drawing every week, provided the broadcast set and announcer was not identified with any particular channel.

case-by-case basis. *Schneider,* 308 U.S. at 161, 60 S.Ct. at 150. It is an assessment which requires a weighing of the asserted constitutional protection against the challenged exercise of governmental power. *Konigsberg,* 366 U.S. at 49, 81 S.Ct. at 1005.

■ The instant case presents a question concerning incidental impact by a state action on activity potentially protected by the First Amendment.[5] Here the point of departure for analysis is the character of the place where the activity is sought to be carried out and the inhibition occurs. *Cornelius v. NAACP Legal Def. & Educ. Fund,* —— U.S. ——, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985); *Perry Educators Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); *San Diego Comm. Against Registration and the Draft (CARD) v. Governing Bd.,* 790 F.2d 1471, 1474, 1475 (9th Cir.1986). The character of the place, whether it is a public forum or is not a public forum, controls the extent to which First Amendment rights may be exercised, the extent to which government inhibitions may be placed on such exercise and the weight to be given governmental interests engendering those inhibitions. *Perry,* 460 U.S. at 44, 103 S.Ct. at 954.

■ In *Perry* the Supreme Court delineated three types of fora: First, those places which traditionally have "been held in trust for the use of the public," *e.g.,* streets, sidewalks, and parks. 460 U.S. at 45, 103 S.Ct. at 955, *quoting Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). In such places content-neutral inhibitions can only occur if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." 460 U.S. at 45, 103 S.Ct. at 955.

■ The second type of place discussed is where public property "has been opened for use by the public as a place for expressive activity." *Id.* While government has no obligation to open such places, once opened and kept open, they are "bound by the same standards as apply in a traditional public forum." *Id.* at 45–46, 103 S.Ct. at 954–55.

■ The third type of forum is "[p]ublic property which is not by tradition or designation a forum for public communication." *Id.* at 46, 103 S.Ct. at 955. "In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.; see also United States Postal Service v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129–30, 101 S.Ct. 2676, 2685, 69 L.Ed.2d

---

5. There are two basic ways in which government may transgress against First Amendment guarantees. Government may seek to silence an activity protected under the amendment because of the viewpoint expressed or information disseminated by or through the activity—a content oriented approach. *See, e.g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1975) (invalidating state prohibition against advising consumers of prices of over-the-counter drugs); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (invalidating statute barring teacher employment on grounds of membership in a particular organization); *Mills v. Alabama,* 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (invalidating a ban on discussing political candidates on last day of the election process); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (invalidating statute prohibiting the teach-ing of modern foreign languages in any school to students below a certain grade).

Government may also impinge upon protected First Amendment rights when it pursues goals not related to speech but to valid governmental objectives. The pursuit of such goals may lead to governmental conduct which incidentally restricts or discourages the flow of ideas or information. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (upholding restrictions on amount of campaign contributions); *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (requiring reporters to reveal sources to grand juries); *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (prohibiting the use of loudspeakers to communicate comments regarding a labor dispute).

The instant case presents a question falling into the second category: incidental impact on potentially First Amendment protected rights.

517 (1981) (quoted in *Perry*, 460 U.S. at 45–46, 103 S.Ct. at 954–55).

 The studios of Channel 3 are not traditional public forums. They are private property.[6] They are being used, however, for a brief moment each week, for a limited public purpose, the Pick drawing. This is a state-sponsored commercial enterprise. I find such an enterprise is subjected to the standards enunciated for non-public forums.[7] *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 303–304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974); *United States Southwest Africa/Namibia Trade & Cultural Council v. United States*, 708 F.2d 760, 767 (1983 D.C.Cir.). Where commercial activity is the state action at issue, conscious limitations on access are permissible where the limitations are consistent with the activity and are not arbitrary in their implementation. *Lehman*, 418 U.S. at 304, 94 S.Ct. at 2717; *Gannet Satellite Information Network, Inc. v. Metropolitan Transp. Auth.*, 745 F.2d 767, 775 (2d Cir.1984). The analysis to be applied is that found in *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (the conduct for which First Amendment protection is claimed should not be "incompatible with the normal activity of a particular place at a particular time."). If the form of expression urged is incompatible with the intended use, then it may be barred. *Perry*, 460 U.S. at 46–49, 103 S.Ct. at 955–57; *Gannett*, 745 F.2d at 773.

*Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), is a seminal case regarding the conflict between governmental commercial activity and asserted First Amendment rights. *Lehman* involved the city's operation of a transit system and the denial of advertising space to political candidates. Most significantly to the analysis here, the Court found that the city transit system, with its advertising cards, was not a public forum. 418 U.S. at 304, 94 S.Ct. at 2717. There being no public forum, government action serving reasonable objectives did not rise to constitutional trespasses. Noting the jealous protection given First Amendment guarantees, *id.* at 302–03, 94 S.Ct. at 2716–17, the Court found that the commercial considerations inherent in the city's operation of the transit system overbalanced any constitutional claims. *Id.* at 304, 94 S.Ct. at 2717.

*Governmental Interest in the Lottery*

 When a state agency is engaged in a permitted commercial activity, raising of revenue becomes a significant governmental interest entitled to deference. *Gannett*, 745 F.2d at 775, *citing Lehman*, 418 U.S. at 304, 94 S.Ct. at 2717; *see also Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*, 510 F.Supp. 81, 86 (D.Conn.1981) (a lesser restriction would diminish the future economic returns available to the city from its operation of the arena).

Commercial activity by a governmental entity is not the only economic interest which can be successfully balanced against these constitutional claims—even when the claims are raised by the press. It is a

6. This is not situation where private property is actually public property leased to a private entity for private purposes. *See Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (it is not illogical to have equal access to the public property and arbitrary denials of access to the "private" property located within the public enclave).

In the case at bar what exists is a limited public use within a private enclave.

7. The case primarily relied upon by plaintiffs, *American Broadcasting Companies, Inc., v. Cuomo*, 570 F.2d 1080 (2d Cir.1977), is readily distinguishable from the case at bar. In *Cuomo* the plaintiff, ABC, was barred from covering

election night returns and reactions at campaign headquarters by various candidates. Because the activity, comment upon the electoral returns is expressive activity and central to the democratic process, the candidates' headquarters became, for the evening public forums. As the court noted, "there [was] a dedication of those premises to public communications use." 570 F.2d at 1083. There being such a dedication, all media must have equal access. *Id.*

In the case at bar there is no dedication to public expressive activity. That element which is news, the Pick results, is available equally to the media. The remainder, which is entertainment, has protected value for the Lottery.

matter of settled law that the states and the federal government can subject the press "to generally applicable economic regulations without creating constitutional problems." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581, 103 S.Ct. 1365, 1369, 75 L.Ed.2d 295 (1983). The Supreme Court, in enunciating this position, has taken a broad view of economic-grounded regulation, for example, including within the definition, antitrust matters, door-to-door solicitation, and labor standards and regulations. To be constitutionally valid vis a vis the press the economic regulation may not single out the press unless that burden is necessary to achieve an overriding governmental interest. *Id.* at 582, 103 S.Ct. at 1370. That was not the situation for the special tax at issue in *Minneapolis Star.*

■ Thus, if a regulation with economic impact is one geared solely toward raising revenue, then a special application to the press cannot be justified. *Id.* at 586, 103 S.Ct. at 1372. If, however, a significant additional governmental or public purpose is served, that a economic burden is placed on the exercise of First Amendment rights does not invalidate the regulation. *Cf. Heffron v. International Society for Krishna Consciousness (ISKCON)*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981) (licensing fee for distribution of materials at state fair not violative where the purpose of the fee and other restraints is to maintain public safety and convenience, these being significant governmental interests).

In the case at bar the significant governmental interest is the opportunity of the public to see the drawing live every week. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) ("It is the right of viewers and listeners, not the right of the broadcasters, which is paramount."). While everyone is willing to broadcast the drawing when the stakes are high and public interest even higher, there is no guarantee beyond the life of this lawsuit that the media will maintain such interest on a week

to week basis. If, as it has been argued, and which this Court accepts, the public has a right to attend and observe the drawing every week, then it is not unreasonable to guarantee that the drawing will be telecast every week. The Commission has determined, and it is not an unreasonable determination, that such a guarantee can only be contractually obtained. A contract requires consideration. The consideration which the Commission offers broadcasters is not an exclusive contract but that anyone wishing to broadcast the drawing must provide the Commission with equal services and benefits. In effect, anyone who commits to providing to the Commission a weekly broadcast at a definite time, as well as advertising services, will be in no worse a commercial position than their broadcast competitors.

### Entertainment Value of the Weekly Drawing

That the Pick's winning numbers are news is not disputed. *New Jersey State Lottery Comm'n v. United States*, 491 F.2d 219, 222 (3d Cir.), *vacated as moot*, 420 U.S. 371, 95 S.Ct. 941, 43 L.Ed.2d 260 (1975) (winning lottery numbers are news). All stations have been offered immediate and simultaneous access to those winning results. What they have not been afforded is a right to broadcast in its entirety the drawing itself. The drawing has entertainment value and as such has certain offsetting value against asserted first amendment rights. *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576, 97 S.Ct. 2849, 2857, 53 L.Ed.2d 965 (1977).

■ *Zacchini* recognizes that a protected economic interest lies in the publicity related to a person's public commercial activities. Further, though these public commercial activities—often characterized as entertainment—have news value, the protected interest of the owner is sufficient to offset whatever press rights there might be in reporting those activities. 433 U.S. at 578, 97 S.Ct. at 2859.

Zacchini was a human cannonball, a seemingly unique profession. He had a fifteen second act which he performed at

state and county fairs. A local television station filmed the entire act and then broadcast it during a news program. Zacchini sued, alleging that the showing of his performance constituted an unpermitted appropriation of his personal property. *Zacchini*, 433 U.S. at 564, 97 S.Ct. at 2851. The Supreme Court agreed with Zacchini, finding that a "broadcast of a film of [Zacchini]'s entire act poses a substantial threat to the economic value of that performance." *Id.* at 575, 97 S.Ct. at 2857[8]. The Court adopted the position that "[n]o social purpose" would be served by providing free access to that which has market value and would normally require some consideration. *Id.* at 576, 97 S.Ct. at 2857. Further, broadcast of the entire event went to the heart of Zacchini's abilities to earn a living from his skills. *Id.* Noting that Zacchini did not want to enjoin other's use of his act, only that "he want[ed] to be paid for it" the Court rejected the argument that this was merely an important news event freely available to the press. *Id.* at 578, 97 S.Ct. at 2859. Finally, the Court also stated that the state could by its statutes, govern press access to such events, the matter not rising to constitutional proportions. *Id.* at 579–80, 97 S.Ct. at 2859.

■ A protected interest in the public showing of an entire performance, applies not only to individuals but to organizations, both private and public. *Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*, 510 F.Supp. 81 (D.Conn.1981). In *Post Newsweek* the International Skating Union, the controlling body of world-class amateur skating, entered into an exclusive broadcast contract with an entity related to the American Broadcasting Companies. The staging of the 1981 World Figure Skating Championships was awarded to the Skating Club of Hartford, Inc. The championships were to be staged at a municipally-operated arena. The award of the championships was subject to an existing exclusive television rights contract. In prepar-

ing for the championships the Skating Club advised local television stations they could enter the arena and film portions of the championships provided they would sign an agreement not to broadcast any footage of the event until ABC had broadcast its entire telecast of the championships. A local television station attacked the prohibition on First and Fourteenth Amendment grounds, claiming a right "to provide immediate reporting of the newsworthy event." 510 F.Supp. at 83–84.

The court, noting that all media and the general public could attend the event if they would conform to the contractual restrictions, characterized the case before it as a question of whether the plaintiff station might have a special access denied to others. *Id.* Declaring first that the contractual provisions would be given full effect if pertinent to a wholly private endeavor, the court found that in this instance the municipality was conducting itself as a commercial entity in operating the civic arena. *Id.* at 85. Noting that the arena competed with similar facilities, the court declared that where the city acted in such a commercial capacity "the contractual restrictions are constitutional if they are not arbitrary or capricious." *Id.* at 86, *citing Lehman*, 418 U.S. at 303, 94 S.Ct. at 2717. The court further found that the arena was not being used for the exchange of ideas but rather for an entertainment presentation, and while entertainment is news it is on the periphery of First Amendment protections. 510 F.Supp. at 86. The court concluded that television broadcast rights have a unique impact on the value of an event and that allowing unlimited, uncompensated access to an event would jeopardize its future economic value. *Id.*

*State Interest in Ensuring Publicization of the Drawing*

Instantly, unrestricted and uncompensated broadcasts of the Pick drawing would affect adversely the economic posture of

---

**8.** The Supreme Court noted that the commentary during the newscast was favorable to Zacchini and in fact urged viewers to go to the county fairgrounds and see the performance in person.

433 U.S. at 564 n. 1, 97 S.Ct. at 2851 n. 1. This however, did not lessen his right to recover for the infringement upon his property rights.

the Lottery. If all Lottery publicity must be purchased, then maximum net revenue from the Lottery will be reduced. The Commission could also buy the time for televising the drawing. This would further reduce the net revenue, without any benefit to the Commission over its present contractual arrangements. If the Commission purchased the time at ten o'clock on Saturdays from Channel 3 would plaintiffs' claim be constitutionally impaired? Not so. Plaintiffs could still claim the right to broadcast the lottery or not, as they choose to do. The validity of plaintiffs' claim turns not on how, absent arbitrary circumstances, the choice is made for a broadcasting venue, but rather whether this is a governmental activity in which such a choice can be made.

Arizona's citizens have directed, through their ballots, that the state enter into competition for the wagering-entertainment-discretionary dollar of the public. In short, the state's voters have directed that the state enter into the commercial marketplace of amusement and entertainment. The status of the Lottery is in fact evidenced by placement of its governing statutes in the Arizona Revised Statutes title regulating the operation of amusements and sports in Arizona. 2 Ariz.Rev.Stat. Ann. Title 5 (Supp.1986).

As part of their determinations as how to have the Pick meet the publicly mandated goal of "maximum amount of net revenue," the Director invited Arizona television stations to submit bids for televising the Pick drawing. The requests for bid were treated as commercial overtures designed to obtain a guaranteed weekly showing of the drawing at a specific time and place, and to obtain advertising benefits for the Lottery, such as promotional advertisements on television and in the print media.

It does not appear that any of the bid recipients treated the matter differently. The present contention that the drawing itself was a news event and not merely commercial entertainment seems to have arisen as a result of the controversy surrounding national telecasts of the Fourth of July—Statute of Liberty festivities. Until then, it appears, no one considered they had a First Amendment right to film and broadcast live and in its entirety, the Pick drawing. This absence of constitutional interest is evidenced by the plaintiffs' conduct during the last two years.

In its first year of operation Channels 3 and 9 were the only stations, of those party to the suit, to submit bids. In the second year Channel 10 became a bidder. Channel 12, the fourth station a party to this action, has never, before intervening here, expressed an interest in televising the drawings.

Plaintiffs' past conduct regarding the activity at issue is relevant to determining the appropriateness of preliminary injunctive relief. *WPIX v. League of Women Voters*, 595 F.Supp. 1484, 1493 (S.D.N.Y. 1984). A balancing of equities is, after all, part of the analysis upon which the issuance of injunctive relief is predicated. *Id.* at 1487. Thus, plaintiffs' lack of interest until now in The Pick drawing as news arguably demonstrates that the Pick drawing is a commercial event with some news interest rather than a public, governmental event fully implicating first amendment protections.

The Director maintains Channels 3 and 9 were the successful bidders because they offered state-wide broadcast capability at a specific time, and a highly advantageous promotional package. The consistency of broadcast services and promotion are qualities the Director believes are necessary to make the Pick a continued success. In return for the benefits bestowed on The Pick the broadcasters receive in return whatever commercial benefit is derived from televising the drawing.

The broadcast contract offered by the Commission also protects the public's interest in seeing the drawing live every week. If there is no contract requiring weekly telecasting of the event then this public interest may or may not be met as to any future drawing. The public's ability to receive broadcasts is also a substantial gov-

ernmental interest. *Red Lion*, 395 U.S. at 390, 89 S.Ct. at 1806.

Having initially found that the studio of Channel 3 is not a public forum, a substantial or compelling governmental interest is not necessary to validate the inhibitions on broadcasting of the Pick by those who have not contracted for that privilege. *See Perry*, 460 U.S. at 45–46, 103 S.Ct. at 954–55. The inhibitions are not content oriented but instead are consistent with the commercial activity occurring thereon. *See Lehman*, 418 U.S. at 304, 94 S.Ct. at 2717. Alternatively, if Channel 3's studios are in fact, for the period while the drawing is taking place, a forum designated "for expressive activity," *Perry*, 460 U.S. at 45, 103 S.Ct. at 955, thereby implicating a higher standard for a counterbalancing governmental interest, such interests are present.

The Commission has a substantial interest in making the Pick, and relevant here, a commercial success. The Commission also has a substantial interest in ensuring that the public can view the drawing live every week. Both of these compelling interests are met by having the Pick drawing publicized and broadcast at a specific time, on a specific television station or stations.

The alternatives suggested by plaintiffs, that they will stipulate to broadcasting the Pick for the life of the current contract, or that the newsworthiness of the event itself will guarantee weekly coverage, do not satisfy the compelling governmental interests. They provide, at best, only short term, speculative guarantees. The governmental and public interest in the Lottery is long term. Therefore, any broadcast scheme which does not guarantee live weekly coverage for the Pick drawing does not provide a least restrictive alternative.

9. *See Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir.1977) (government must publish or otherwise make publicly known the actual standard employed in determining who is qualified for access to a governmental forum); *see also Gannett Satellite Info. Net. v. Metropolitan Transp. Auth.*, 745 F.2d 767, 776 (2d Cir.1984) (guidelines for granting access would be helpful).

However, the broadcasting of the Pick arguably implicates sensitive constitutional concerns. To fully satisfy those concerns, prior to a new broadcast contract being awarded, the Director shall publish a minimum criteria which, if met, shall result in the receipt of a broadcast contract.[9]

## STANDARDS FOR GRANTING A PRELIMINARY INJUNCTION

In this circuit, the criteria for granting preliminary injunctive relief requires plaintiff establish:

(1) a strong likelihood of success on the merits;

(2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted;

(3) a balance of hardships favoring the plaintiff; and

(4) advancement of the public interest (in certain cases).

A moving party may meet its burden by demonstrating either:

(1) a combination of probable success on the merits and possibility of irreparable injury; or

(2) that serious questions are raised and the balance of hardships tips sharply in its favor.

The difference between these two tests is insignificant and a finding with respect to either establishes the basis for injunctive relief. *Los Angeles Coliseum Comm'n v. National Football League*, 634 F.2d 1197 (9th Cir.1980).

It is settled law that First Amendment violations, if established, constitute irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). Thus plaintiffs possi-

Publication of minimum bid criteria and a rebidding for the current bid period is not required. The parties to the existing contract have invested substantially in the performance of the contract; the challengers have waited so long to raise these issues; and the existing contract has a limited duration remaining. *Cf. WPIX, Inc. v. League of Women Voters*, 595 F.Supp. 1484, 1494–95 (S.D.N.Y.1984).

bly meet one of the relevant criteria. However, based upon the findings enunciated in this Memorandum and Order, plaintiffs do not succeed as to the other criteria.

The foregoing Memorandum and Order in its entirety constitutes the findings of fact and conclusions of law in this proceeding.

Accordingly,

IT IS ORDERED:

1. That defendant Channel 3's Motion to Dismiss is denied;

2. That the Application for Preliminary Injunction is denied; and,

3. That the Director shall cause to be published sixty days prior to the deadline for receiving bids for the broadcast of "The Pick" drawing regulations detailing what minimum benefits and services the Commission shall expect in return for the opportunity to broadcast the drawing.