**PHOENIX NEWSPAPERS, INC., et al., Plaintiffs,**

v.

**TUCSON AIRPORT AUTHORITY, et al., Defendants.**

**No. Civ 87–886 TUC.**

United States District Court, D. Arizona, Tucson Division.

Aug. 2, 1993.

Amended Judgment Aug. 31, 1993.

James F. Henderson, Scult, Lazarus, French, Zwillinger & Smock, P.A., Phoenix, Michael J. Meehan, Meehan & Associates, Tucson, AZ, for plaintiff Tucson Newspapers, Inc.

Terrence A. Jackson, Snell & Wilmer, Tucson, AZ, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARQUEZ, Senior District Judge.

### FINDINGS OF FACT

1. To the extent these Findings of Fact are also deemed to be Conclusions of Law, they are hereby incorporated into the Conclusions of Law that follow.

2. Tucson International Airport (airport) is a public airport operated by Tucson Airport Authority (TAA), a civil, non-profit organization formed for the purpose of operating the airport pursuant to a lease with the City of Tucson. This arrangement is authorized by state statute.

3. Phoenix Newspapers, Inc. (PNI) is an Arizona corporation that publishes *The Arizona Republic, The Phoenix Gazette* and *The Arizona Business Gazette.*

4. TNI Partners is an Arizona corporation which is responsible for circulating and distributing *The Arizona Daily Star* and *The Tucson Citizen* under a joint-operating agreement.

5. TAA receives no funds from the City.

6. TAA's lease with the City requires the airport to promote revenue-producing businesses at the airport and to manage the airport in accordance with sound business practices. The City lease also requires that fees and charges for use of airport facilities may not be excessive or discriminatory.

7. The airport facilities are built, improved, and operated by utilizing a complicated financial structure, which includes long-term airport use agreements with airlines, and revenue bonds secured by pledges of airport revenue from said use agreements.

8. Pursuant to the airport use agreements, the airlines guarantee TAA will have sufficient operating funds from year to year, by creation of a residual fund into which airlines pay landing fees. Any shortfall on operating requirements is made up from this residual fund.

9. The airlines, in exchange for guaranteeing TAA enough money to continue operations, require that TAA conduct operations in a prudent, businesslike manner, and shall apply for and make maximum use of all available federal and state funds for the development of the airport.

10. TAA also receives federal grants for airport capital development from the Airport and Airway Trust Fund. Pursuant to federal statute, recipients of these grants must maintain a fee and rental structure for the facilities and services being provided the airport users which make the airport as self-sustaining as possible.

11. TAA adopted regulations entitled: Rules and Regulations Concerning the Placement of Coin Operated Newspaper Vending Machines (Newsrack Regulations) on June 12, 1989; said Newsrack Regulations were last amended July 7, 1992.

12. In November 1987, PNI sought to replace the newsracks.

13. TAA initially refused to allow PNI to replace the newsracks. The TAA Board of Directors then decided, at its December 1987 meeting, to allow PNI to replace the newsracks provided PNI and pay TAA rent and janitorial fees.

14. The initial rent was calculated based on where the newsracks were located and the amount of floor space occupied by a newsrack, plus an additional percentage rental fee.

15. The monthly fee for newsracks located in the concourse would be a minimum of $38.60 per newsrack. In the lower part of the airport terminal, TAA planned to charge a minimum monthly rent of $41.17 per newsrack.

16. The percentage rental fee would have been equal to 15 percent of the monthly gross sales from all of the machines to the extent that such percentage rental fee exceeded the minimum rent in any one month.

17. The rent for newsracks placed inside the terminal is calculated using the minimum per square foot fee charged to any user of the same category of space, multiplied by the number of square feet occupied by a newsrack, as well as an area extending two feet in front of the newsrack.

18. The charge for two feet of space in front of the newsrack is the standard minimum for vending machine and counter space operations. Likewise, the janitorial fees are standard fees based on the amount of space utilized and are less than the actual cost to TAA to keep the newsracks and the areas around them clean.

19. The janitorial fees were calculated based on a charge of $2 per square foot of space occupied by the newsracks per year.

20. PNI filed a complaint for injunction on November 25, 1987. On March 24, 1989, the Court granted summary judgment to PNI. TAA appealed from that grant of summary judgment.

21. While the appeal was pending, TAA adopted the Newsrack Regulations on June 12, 1989, and then amended them on August 8, 1989, that called for different amounts of fees than it originally sought to impose. Under these regulations, some newsracks would be charged rent and janitorial fees while other newsracks would be charged administrative fees.

22. Under these regulations, TAA sought to charge monthly rent of $21.89 and janitorial fees of $1.75—a total of $23.64—on newsracks in the main terminal building; monthly rent of $18.60 and janitorial fees of $1.75—a total of $20.35—on newsracks in a concourse of the main terminal building; and a monthly administrative fee (but no rent or janitorial fees) of $2.60 per newsrack on the sidewalks outside the international and executive terminal.

23. After TAA adopted the Newsrack Regulations, including the new fee structure, the Ninth Circuit Court of Appeals remanded the case to this Court for reconsideration of the new Newsrack Regulations, 922 F.2d 845.

24. On June 1, 1991, TAA again revised the Newsrack Regulations, including the fee structure. After extensive negotiations and compromises, PNI agreed to proposed revisions restricting the location and number of newsracks and other subjects, but continued to oppose the fee portions of the regulations.

25. This version of the Newsrack Regulations was in effect at the time of trial. Under this version, TAA seeks to charge monthly rent of $15.69 and janitorial fees of $1.17—a total of $16.86—on each newsrack inside the main terminal building; monthly rent of $13.34 and janitorial fees of $1.17—a total of $14.51—on each newsrack in a concourse of the main terminal building; and monthly administrative fees (but no rent or janitorial fees) of $2.58 for each newsrack on the sidewalks outside the international and executive terminals.

26. Tucson International Airport is located at the edge of metropolitan Tucson, and its physical layout and character are such that it is clear to any visitor that he or she is at a place managed and regulated to facilitate air travel. (See Exhibits 115, 116 and 117.)

27. While members of the public may come and go more or less freely through the areas where newsrack locations exist, virtually all traffic is by those traveling to or from Tucson by air, those seeing-off or greeting air travelers, and those employed by TAA, the airlines, or other businesses at the airports that are also involved in some aspect of air travel or service to air travelers. (See Exhibits 115, 116 and 117.)

28. The newsrack locations within the airport terminal are clearly within the area managed for airport operations and could not be reasonably confused with public space of any other nature.

29. The newsrack locations outside the international and executive terminal buildings are on sidewalks leading from airport parking areas to airport facilities at places where a reasonable person would not believe he or she was on property other than that of the airport. *See, e.g., Jacobsen v. U.S. Postal Service,* 993 F.2d 649, 656 (9th Cir.1992) (Court held that federal sidewalks devoted to postal customers are nonpublic fora). (See Exhibits 115, 116 and 117.)

30. By approving locations for newsracks in its Newsrack Regulations, TAA did not intend to voluntarily open those locations for the free dissemination of information or to make those areas available for newsracks other than under the conditions set forth in the regulations, including the payment of fees.

## CONCLUSIONS OF LAW

1. To the extent any of the Findings of Fact contain or include any Conclusions of Law, said Findings of Fact are incorporated herein by reference.

2. Plaintiffs are in the business of producing and distributing newspapers, activities protected by the First Amendment.

■ 3. TAA may not discriminate against Plaintiffs, as compared to other businesses, and its regulation of Plaintiffs' activities must, at the very least, be viewpoint neutral.

■ 4. The Tucson International Airport terminal is not a traditional public forum. *International Society for Krishna Consciousness v. Lee*, 505 U.S. ——, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).

5. The sidewalk locations approved for newsracks by TAA and involved in this case are, likewise, not a traditional public forum. *United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990); *Jacobsen v. U.S. Postal Service*, 993 F.2d 649 (9th Cir.1992).

6. By enacting Newsrack Regulations, which have as one of their purposes to approve specific locations for newsracks, TAA did not create a designated or limited public forum (*Krishna v. Lee, supra*) as there was no voluntary decision on TAA's behalf to open a forum for free speech purposes. *Cornelius v. NAACP Legal Defense & Education Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

7. This Court's standard of review of TAA's Newsrack Regulations is one of reasonableness. *Krishna v. Lee, supra.*

■ 8. Plaintiffs, even though protected by the First Amendment, are not entitled to be free from normal economic burdens of doing business, including those imposed by government, or, as here, a quasi governmental entity. *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

■ 9. Rental and administrative fees that are non-discriminatory, viewpoint neutral, and represent nothing but a normal economic burden of doing business may be applied to newspaper companies. *Id.*

■ 10. TAA's rental fees charged for space occupied by newsracks within the airport terminal are non-discriminatory, as they are the minimum fees charged any user of similar space.

11. TAA's rental fees are commercially reasonable, and constitutionally permissible. *Jacobsen v. U.S. Postal Service, supra.*

12. TAA is entitled to be compensated for its janitorial services in keeping the newsracks clean and free of debris. The janitorial fees set forth in TAA's Newsrack Regulations are reasonable.

13. TAA's administrative fees for newsracks located on the sidewalks outside the international and executive terminal buildings are nominal, less than the actual cost of administering these newsracks and, therefore, cannot be said to be unreasonable.

■ 14. Plaintiffs' privileges provided by the First Amendment do not entitle them to utilize, free of charge, valuable commercial property, even when publicly owned. *See, e.g., Erie Telecommunications, Inc. v. City of Erie*, 659 F.Supp. 580 (W.D.PA.1987) ("The mere happenstance that a commercial enterprise operates on public properties, rather than private properties, should not provide an exemption for costs which accompany the doing of business.").

■ 15. Where a government is acting in its proprietary capacity, it is free to conduct its operation in a businesslike manner, and review of economic regulations will be limited to ascertaining that such regulation is non-discriminatory and viewpoint neutral. *Id.; Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767 (2nd Cir.1984).

■ 16. When a governmental agency by the nature of its operations is engaged in commercial activity, the raising of revenues is a significant governmental interest. *KTSP–TAFT Television v. Arizona State Lottery*, 646 F.Supp. 300 (D.Ariz.1986).

■ 17. Regulations that require First Amendment protected users of space to pay rent on the same basis as any other user of similar space are constitutionally permissible. *Lubavitch Chabad House, Inc. v. City of Chicago,* 917 F.2d 341 (7th Cir.1990) ("... Lubavitch has no constitutional right at issue, since it is free to exercise [First Amendment rights] at O'Hare in the same manner as anyone else—by leasing space or carrying handheld symbols or signs.").

18. The fees required by TAA Newsrack Regulations are non-discriminatory, viewpoint neutral, and do not place any greater economic burden on Plaintiffs and other newspaper operations than on any other business operating at the airport.

19. TAA's rules and regulations concerning the placement of coin operated newspaper vending machines at the airport are constitutional, and TAA is, therefore, entitled to judgment in its favor on Plaintiffs' Complaint for injunction for past rent and administration fees from the date of enactment of the Newsrack Regulations.

### AMENDED JUDGMENT

This matter having come on regularly for trial to the Court on May 17, 1993, and the parties having presented their evidence, submitted their legal memoranda, and argued to the Court, and the Court having previously entered its Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. Defendants, Tucson Airport Authority, Walter A. Burg and Patrick T. Abeln, are granted Judgment against Plaintiffs, Phoenix Newspapers, Inc. and Tucson Newspapers, Inc., on Plaintiffs' Complaint for Injunction.

2. Defendant Tucson Airport Authority is granted Judgment for rental and administrative fees for space occupied by Plaintiffs' newsracks from June 12, 1989 through July 31, 1993, as against Phoenix Newspapers, Inc. in the amount of $5,000.16, and against Tucson Newspapers, Inc. in the amount of $10,801.92.

3. Tucson Airport Authority is entitled to collect rents and administrative fees as set forth in its Newsracks Regulations from August 1, 1993 forward.

4. The parties shall bear their own costs and attorneys fees.